# United States Court of Appeals
## For the First Circuit

No. 11-1775

UNITED STATES OF AMERICA,

Appellee,

v.

JASON WAYNE PLEAU,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

No. 11-1782

IN RE: JASON WAYNE PLEAU,

Petitioner.

---

PETITION FOR A WRIT OF PROHIBITION TO THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Torruella, Boudin, and Thompson,
Circuit Judges.

---

Robert B. Mann, with whom Mann & Mitchell, David P. Hoose, and Sasson, Turnbull & Hoose, was on brief for appellant-petitioner.
Claire Richards, Chief Legal Officer, on brief for amicus curiae Governor Lincoln D. Chafee in support of appellant-petitioner.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief for appellee.

October 13, 2011

**TORRUELLA**, **Circuit Judge**.  Petitioner Jason Wayne Pleau is accused of the armed robbery and murder of a gas station manager in Rhode Island.  Pleau is currently serving an eighteen-year sentence in Rhode Island state prison for parole and probation violations, and has agreed to plead guilty to state charges stemming from the robbery and murder and to accept a sentence of life imprisonment without the possibility of parole.  The issue presented in the current petition is whether the United States, after being rebuffed by the state of Rhode Island in its attempt to take custody of Pleau under the Interstate Agreement on Detainers (IAD), 18 U.S.C. App. § 2, may compel the same result by means of a writ of habeas corpus ad prosequendum.  The issue is brought to us accompanied by a statement by Rhode Island Governor Lincoln Chafee that he would not transfer Pleau to federal custody because doing so would expose Pleau, a Rhode Island citizen, to a potential death sentence on federal charges, in contravention to Rhode Island's longstanding rejection of capital punishment.

The petition presents a question of first impression in this court, as it appears that never before has a state governor denied a federal request for custody under the IAD.  For the reasons stated below, we hold that the federal government is entitled to choose between the IAD and an ad prosequendum writ in seeking custody of a state prisoner for purposes of a federal prosecution, but that once the federal government has put the gears

-3-

of the IAD into motion, it is bound by the IAD's terms, including its express reservation of a right of refusal to the governor of the sending state.

## I.  Background.

### A.  Facts & procedural posture.

On September 20, 2010, Pleau, along with two others, allegedly robbed a Woonsocket, RI gas station manager who was on his way to the bank to deposit the day's receipts.  Pleau is alleged to have shot the victim, David Main, to death during the robbery.  On November 18, 2010, the United States filed a criminal complaint in the United States District Court for the District of Rhode Island, and an arrest warrant was issued.  Shortly thereafter, on November 22, the United States Marshals Service lodged a detainer with the warden of Rhode Island's Adult Correctional Institution, High Security Unit in Cranston, Rhode Island, where Pleau is currently serving a sentence for parole and probation violations.  Pleau and his alleged cohorts were then indicted for robbery affecting interstate commerce, 18 U.S.C. § 1951(a); conspiracy to commit robbery affecting interstate commerce; and possessing, using, carrying, and discharging a firearm in relation to a crime of violence, 18 U.S.C. §§ 924(c)(1)(A) and (j)(1).  The indictment noted that Pleau and his co-defendants are eligible for the death penalty, and specified statutory aggravating factors.

-4-

In order to facilitate Pleau's prosecution under the federal indictment, the district court entered an order transmitting the United States' request for temporary custody of Pleau under the IAD on May 25, 2011.  Approximately one month later, Rhode Island Governor Lincoln Chafee denied the request for custody, citing Article IV(a) of the IAD, which states, in pertinent part, that after a request for temporary custody has been made, "there shall be a period of thirty days . . . within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner."  18 U.S.C. App. § 2, art. IV(a).  Pursuant to 28 U.S.C. § 2241(c)(5), the federal government then petitioned the district court for a writ of habeas corpus ad prosequendum, a form of habeas used to secure a defendant's presence in court.  Pleau filed a motion opposing the request on the same day.

On June 30, the district court granted the Government's request, holding that Pleau lacked standing to challenge the issuance of the writ and denying his claim on the merits as well. The district court, noting that "[i]t appears that this is the first time a governor has dishonored a request by the United States" under the IAD, held that when the IAD "has been invoked and a detainer lodged against a state prisoner, Article IV may afford the governor of the sending State the right to dishonor the request

-5-

to transfer . . . but, in all events does not empower him, or his agents, to disobey a federal court's writ of habeas corpus <u>ad prosequendum</u> as to that prisoner." <u>United States</u> v. <u>Pleau</u>, No. CR. 10-184-1S, 2011 WL 2605301, at *3 (D.R.I. June 30, 2011). The court issued the writ requiring Pleau's presence in federal court on Friday, July 8, 2011 at 11:00 a.m. for arraignment.

Pleau filed a motion in this court to stay execution of the writ as well as a motion seeking a writ of prohibition. On July 7, 2011, we granted a stay, directing the parties to file briefs and setting the case for oral argument. Governor Chafee appeared before this court first as an <u>amicus curiae</u> supporting Pleau, and later as an intervenor-appellant.

## B.  The IAD and habeas corpus <u>ad prosequendum</u>

Before turning to the merits, we briefly sketch the background of the IAD and <u>ad prosequendum</u> writs, as well as the standards governing the use of writs of mandamus and prohibition.

The IAD, adopted by Congress in 1970, is an agreement between forty-eight states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. <u>United States</u> v. <u>Currier</u>, 836 F.2d 11, 13-14 (1st Cir. 1987). The IAD was intended to "encourage the expeditious and orderly disposition" of outstanding charges against a defendant based on untried indictments, informations, or complaints from multiple jurisdictions, 18 U.S.C. App. § 2, art. I, and to "provide

-6-

cooperative procedures among member States to facilitate such disposition." United States v. Mauro, 436 U.S. 340, 351 (1978).

To obtain custody under the IAD, the requesting state must first file a "detainer" with the state with custody, notifying the custodial state of the untried charges pending against the prisoner. See United States v. Kenaan, 557 F.2d 912, 915 (1st Cir. 1977) ("A detainer is a formal notification, lodged with the authority under which a prisoner is confined, advising that the prisoner is wanted for prosecution in another jurisdiction."). To actually obtain custody, the requesting state must additionally file with the sending state a written request for custody, at which point the latter state has thirty days in which to determine whether to honor the request. 18 U.S.C. App. § 2, art. IV(a); Mauro, 436 U.S. at 351-52.

Like requests for custody under the IAD, writs of habeas corpus ad prosequendum are creatures of statute. Ad prosequendum writs were first interpreted as arising out of the First Judiciary Act, 1 Stat. 81-82 (1789), by Chief Justice Marshall in Ex parte Bollman, 8 U.S. (4 Cranch) 75, 98 (1807). In that case, Chief Justice Marshall distinguished varieties of habeas, describing habeas corpus ad prosequendum as the form of the writ "which issue[s] when it is necessary to remove a prisoner, in order to prosecute, or bear testimony, in any court, or to be tried in the proper jurisdiction wherein the fact was committed." Id. The

-7-

present-day writ arises under 28 U.S.C. § 2241(c)(5). See Kenaan, 557 F.2d at 916 ("A federal writ of habeas corpus [ad prosequendum] under § 2241 is . . . a federal court order, commanding the presentation of a prisoner for prosecution or as a witness in a federal court. It is judicially controlled by the federal district court, which may issue it for the production of a prisoner when 'it is necessary to bring him into court to testify or for trial.'" (quoting 28 U.S.C. § 2241(c)(5))). See also Carbo v. United States, 364 U.S. 611, 613-20 (1961) (discussing the history of ad prosequendum writs).

### C. Writs of prohibition.

The All Writs Act, 28 U.S.C. § 1651(a), empowers federal courts to issue extraordinary (or "prerogative") writs where "necessary or appropriate in aid of their respective jurisdictions." Writs of mandamus instruct lower courts to take certain specified acts; writs of prohibition instruct them to refrain from doing so. See In re Perry, 859 F.2d 1043, 1044 n.1 (1st Cir. 1988); In re Pearson, 990 F.2d 653, 656 (1st Cir. 1993). As such, writs of mandamus and writs of prohibition are mirror images of each other, and "derive from the same statutory basis and incorporate the same standards." In re Justices of the Superior Court Dep't of the Mass. Trial Court (In re Mass. Trial Court), 218 F.3d 11, 15 n.3 (1st Cir. 2000). We therefore "make no distinction between them," In re Atl. Pipe Corp., 304 F.3d 135, 138 n.1 (1st

Cir. 2002), and "will continue the practice of referring to them interchangeably." In re Mass. Trial Court, 218 F.3d at 15 n.3.

Like mandamus, a writ of prohibition is a "drastic remedy, to be used sparingly and only in unusual circumstances." In re Mass. Trial Court, 218 F.3d at 15 (internal quotation marks omitted). The standards for determining when it is appropriate to issue a writ of mandamus or prohibition reflect the writs' anomalous character. The First Circuit has acknowledged two subspecies of mandamus writs: supervisory and advisory.[1] Supervisory mandamus is used "to correct an established trial court practice that significantly distorts proper procedure." United States v. Horn, 29 F.3d 754, 769 n.19 (1st Cir. 1994). This form of mandamus "is ordinarily appropriate in those rare cases in which the issuance (or nonissuance) of an order presents a question anent the limits of judicial power, poses some special risk of irreparable harm to the appellant, and is palpably erroneous." Id. at 769. Supervisory mandamus requires the petitioner to "show both that there is a clear entitlement to the relief requested, and that

---

[1] Although the cases discussing the supervisory/advisory distinction do so in the context of writs of mandamus, given that writs of prohibition are "merely the obverse" of writs of mandamus, In re Atl. Pipe Corp., 304 F.3d at 138 n.1, we presume that the supervisory/advisory distinction applies in the context of writs of prohibition as well. See, e.g., In re Sony BMG Music Entm't, 564 F.3d 1, 9-10 (1st Cir. 2009) (exercising our "advisory mandamus authority" to issue a writ "prohibit[ing] enforcement of the challenged order")(emphasis added).

irreparable harm will likely occur if the writ is withheld." In re Cargill, Inc., 66 F.3d 1256, 1260 (1st Cir. 1995).

By contrast, advisory mandamus is not directed at "established" practices, Horn, 29 F.3d at 769 n.19, but rather at resolving issues that are "novel, of great public importance, and likely to recur." Id. at 769. A case may be fit for advisory mandamus when it presents a "systematically important issue as to which this court has not yet spoken." In re Atl. Pipe Corp., 304 F.3d at 140; see also In re Mass. Trial Court, 218 F.3d at 15 n.4; In re The Justices of the Supreme Court of P.R., 695 F.2d 17, 25 (1st Cir. 1982) (recognizing advisory mandamus as appropriate when "[t]he issue presented is novel in this circuit, it is important, and . . . may well recur before further appellate review is possible"). Advisory mandamus has its roots in the Supreme Court's acknowledgment that federal courts of appeal have "the power to review . . . basic, undecided question[s]." Schlagenhauf v. Holder, 379 U.S. 104, 110 (1964); see also Note, Supervisory and Advisory Mandamus Under the All Writs Act, 86 Harv. L. Rev. 595, 596 (1972) (describing Schlagenhauf as holding that "in certain prescribed circumstances, the courts of appeals could properly decide 'novel and important' questions of law brought to them on petitions for mandamus").

# III. Discussion

## A. Standing.

As an initial matter, we note that Governor Chafee's intervention in the present appeal moots a simmering dispute between the original parties -- Pleau and the United States -- as to whether Pleau had standing to contest the issuance of the habeas writ. The district court noted that it is "axiomatic" that "a state prisoner is <u>without standing</u> to contest a federal court's issuance of a writ of habeas corpus <u>ad prosequendum</u>." <u>Pleau</u>, 2011 WL 2605301, at *2 (emphasis in original) (internal quotation marks omitted) (quoting <u>Derengowski</u> v. <u>U.S. Marshal</u>, 377 F.2d 223, 223 (8th Cir. 1967)). The district court rejected Pleau's argument, renewed on appeal, that the Supreme Court's recent decision in <u>Bond</u> v. <u>United States</u>, 131 S. Ct. 2355 (2011), implies that he does have standing as he is challenging "governmental action taken in excess of the authority that federalism defines," <u>id.</u> at 2363-64. <u>See</u> <u>Pleau</u>, 2011 WL 2605301, at *2.

The United States insists that Pleau does not have standing "to interfere with agreements (or disagreements) between executives concerning custody transfers," in part because a state prisoner "may not complain if one sovereignty waives its strict right to exclusive custody of him," as "[s]uch a waiver is a matter that addresses itself solely to the discretion of the sovereignty making it and of its representatives with power to grant it."

-11-

Ponzi v. Fessenden, 258 U.S. 254, 260 (1922).  At oral argument, the United States represented that if Pleau does not have standing, then this case is left with "no legitimate party."

However, Governor Chafee has since sought and been granted leave to intervene in this case in order to "fully vindicate his rights under the IAD."  Governor Chafee, like Pleau, argues that once the United States has invoked the IAD, it may not later circumvent the IAD's express allocation of a right of refusal to the governor of the sending state by means of an ad prosequendum writ.  Given that no one contests that Governor Chafee, as the representative of Rhode Island, has standing to raise such a claim, the concerns regarding whether Pleau does or does not have standing to challenge the issuance of the ad prosequendum are now moot, and we express no opinion on the merits of that issue.

**B.  Which writ?**

The United States insists that Pleau's arguments[2] do not meet the standards for mandamus.  The United States argues that Pleau cannot establish (a) that he is "clearly entitled" to relief, or (b) that he is likely to suffer irreparable harm.  In mounting this argument, the United States evidently presupposes that the applicable writ is supervisory in character.  However, as noted above, supervisory mandamus is directed at correcting "established"

---

[2]    Because Governor Chafee's and Pleau's arguments are substantially similar, we treat them as one and the same.

-12-

trial court practices.  Horn, 29 F.3d at 769 n.19.  The parties, as well as the district court, have represented that Governor Chafee's denial of the United States' IAD request for custody over Pleau -- which precipitated the current appeal -- is the first time that a state has denied an IAD request by the federal government.  The issue presented by this petition thus does not concern an established trial court practice, but is rather novel and a matter of first impression.  It is thus more properly viewed under the rubric of advisory, rather than supervisory, prerogative writs.

The standard for an advisory writ of prohibition does not overlap with that for a supervisory writ.  See Horn, 29 F.3d at 769 (recognizing that advisory mandamus may lie "even though all the usual standards [of supervisory mandamus] are not met") (emphasis added).  It is therefore not incumbent upon Pleau to show irreparable harm or clear entitlement to relief.  See In re Sony BMG Music Entm't, 564 F.3d 1, 4 (1st Cir. 2009) ("When advisory mandamus is in play, a demonstration of irreparable harm is unnecessary."); In re Atl. Pipe Corp., 304 F.3d at 139 (noting that a showing of a risk of irreparable harm and palpable error "typically apply only to supervisory mandamus") (emphasis in original).  The applicable standard is, rather, whether the issue raised by Pleau is novel, of great or systemic importance, and likely to recur prior to effective review.

-13-

We believe the question presented meets all three criteria. Governor Chafee's denial of the United States' request for custody of Pleau appears to be unprecedented. The question of whether a state governor retains his or her prerogative under the IAD to deny a subsequent request for custody, even when that occurs under the guise of an ad prosequendum writ, has never been squarely considered by the First Circuit. Nor, for reasons we explain more fully below, is Supreme Court precedent dispositive on this point. The question raised by Pleau's petition is novel.

The question is also of great and systemic importance. As Governor Chafee made clear in a statement released on the same day as his denial of the IAD request, he opposes transferring Pleau to federal custody on grounds of Rhode Island's "longstanding policy" against capital punishment. While Governor Chafee's refusal to allow the federal government to seek the execution of a Rhode Island citizen "in no way minimize[s] the tragic and senseless nature" of Main's murder, he stated that he could not "in good conscience" allow the federal government to ride roughshod over Rhode Island's "conscious[] reject[ion]" of execution as an acceptable form of state punishment. Pleau had, at this point, already indicated his agreement to plead guilty to the state charges and accept a sentence of life without the possibility of parole. Therefore, the only additional punishment that a federal conviction might bring would appear to be authorization to kill

-14-

Pleau.  The present case thus presents a stark conflict between federal and state policy prerogatives on a matter of literally life-and-death significance.[3]

Finally, given the unsettled character of the question presented, the numerous states and territories that are party to the IAD, and the fact that, as the United States has represented to us, thousands of ad prosequendum writs are issued each year, it is not unreasonable to suspect that the question presented in the instant petition is likely to recur.  Indeed, insofar as the United States is correct that the typical criminal defendant lacks standing to challenge the issuance of an ad prosequendum writ -- whether issued before or after the invocation of the IAD -- the question presented "may well recur before further appellate review is possible."  In re The Justices of the Supreme Court of P.R., 695 F.2d at 25.

Moreover, Governor Chafee's invocation of the IAD and intervention in this case present a unique opportunity for review

---

[3]    We pause to note that the crimes Pleau is alleged to have committed -- armed robbery and murder -- are quintessential state crimes, and betray on their face no hint of any uniquely federal interest.  See United States v. Jiménez-Torres, 435 F.3d 3, 14-15 (1st Cir. 2006) (Torruella, J., concurring) (objecting to unwarranted extension of federal criminal jurisdiction over traditionally state crimes).  Moreover, given that Pleau has already agreed to plead guilty to state charges and accept a life sentence without the possibility of parole, it is frankly unclear what is to be gained from pursuing federal charges in this case, particularly in light of the truly extraordinary costs of capital litigation.

-15-

of this slippery issue: the Governor unquestionably has standing, where Pleau might or might not.  The Governor's standing, though, might evaporate if Pleau were transferred, in which case it is unclear what remedy might be available to the Governor.  This means that on direct appeal, if Pleau also lacks standing to challenge his transfer under the IAD (as the United States insists) then this question will evade effective review.[4]  In the end, we very well might not be able to consider this easily duplicable and important question if not now.

We conclude that Pleau's petition meets the standard for an advisory writ of prohibition.  As prerogative writs such as writs of prohibition are discretionary rather than mandatory, we now turn to consider whether the writ should issue.

### C.  The merits.

Article VI, Clause 2 of the Constitution, otherwise known as the Supremacy Clause, states in part that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any

---

[4]   Other cases, including Mauro, have addressed IAD questions on direct appeal, although always in the context of a prisoner asserting his own rights under the IAD, such as his speedy trial rights.  See, e.g., Mauro, 436 U.S. at 348; New York v. Hill, 528 U.S. 110, 118 (2000) (holding that the defendant's speedy trial right under the IAD had been waived).  No case has ever addressed the IAD on appeal in the context of a prisoner standing in for a sending-state governor who refuses a transfer under Article IV of the IAD.  Cf., e.g., id. at 118 n. 3 (recognizing that "the sending State may have interests distinct from those of the prisoner," and noting that the Hill case "does not involve any objection from the sending State").  We repeat that this situation is unique.

-16-

Thing in the Constitution or Laws of any State to the Contrary notwithstanding." As we have previously noted, a federal court's authority to issue a writ of habeas corpus ad prosequendum is grounded on a federal statute, 28 U.S.C. § 2241(c)(5). Prima facie, it might well be the case that a state's refusal to honor an ad prosequendum writ would normally raise serious issues under the Supremacy Clause.

However, that is not the case now before us. Governor Chafee has not asserted a free-standing right to ignore federal ad prosequendum writs. Governor Chafee asserts, rather, that he is authorized under Article IV(a)[5] of the IAD to decide whether to honor a request for custody made by a receiving state, and that an ad prosequendum writ that post-dates the invocation of the IAD is, under federal law, treated as just such a written request. We have previously explained that, as a "congressionally sanctioned interstate compact within the compact clause, the [IAD] is a federal law subject to federal construction." Currier, 836 F.2d at 13 (citation omitted). Therefore, the case now before us involves two federal statutes and the question of how they may be interpreted such that each is given effect in a manner that is consistent with the operation of the other.

---

[5] Section 2 of the Interstate Agreement on Detainers Act "sets forth the agreement as [originally] adopted by the United States and by other member jurisdictions." Mauro, 436 U.S. at 343 n. 1. Provisions of the Agreement will be referred to by their article numbers as set forth in 18 U.S.C. App. § 2.

-17-

The United States insists that Pleau's petition has already been foreclosed by the Supreme Court's decision in Mauro, in which the Court stated that Article IV(a) of the IAD "does not purport to augment the State's authority to dishonor" an ad prosequendum writ, and that "[i]f a State has never had authority to dishonor an ad prosequendum writ issued by a federal court, then this provision could not be read as providing such authority." Mauro, 436 U.S. at 363. Several other circuits have subsequently arrived at similar conclusions. See United States v. Trafny, 311 F. App'x. 92, 95-96 (10th Cir. 2009); United States v. Graham, 622 F.2d 57, 59-60 (3d Cir. 1980); United States v. Bryant, 612 F.2d 799, 802 (4th Cir. 1979).[6] But see United States v. Scheer, 729 F.2d 164, 170 (2d Cir. 1984) (stating that "the historic power of the [ad prosequendum] writ seems unavailing once the government elects to file a detainer in the course of obtaining a state prisoner's presence for disposition of federal charges.")

We are not as confident that Mauro is quite as clear as claimed by the United States. After all, Mauro had two core holdings which were necessary to resolving the cases consolidated before the Court, and both of these holdings undermine rather than

---

[6]   Significantly, in none of these cases did the governor of the sending state actually disapprove the federal government's IAD request or seek to block transfer under a subsequent ad prosequendum writ. See Trafny, 311 F. App'x at 94 (state governor acquiesced in defendant's transfer to United States' custody within thirty days of the issuance of the ad prosequendum writ); Graham, 622 F.2d at 58 (same); Bryant, 612 F.2d at 801 (same)

-18-

support the United States' position. First, the Court held that the United States is a party to the IAD not just as a sending state, but as a receiving one as well, and that it is therefore not exempt from the restrictions the IAD places on receiving states. Mauro, 436 U.S. at 354. Second, the Court held that while the federal government could choose to seek custody over a state prisoner by means of an initial habeas writ or under the IAD, once an effective IAD detainer had been lodged, "the Agreement by its express terms becomes applicable and the United States must comply with its provisions." Id. at 362. "[O]nce a detainer has been lodged," the Court noted, "the policies underlying the [IAD] are fully implicated," and thus there is "no reason to give an unduly restrictive meaning to the term 'written request for temporary custody.'" Id. Under these circumstances, "it clearly would permit the United States to circumvent its obligations under the Agreement to hold that an ad prosequendum writ may not be considered a written request for temporary custody." Id. Both of these holdings indicate that the United States stands, for purposes of the IAD, on an equivalent footing with other states, and that, once it has invoked the IAD, it is bound by the terms thereof, including Article IV(a).

Moreover, the interpretation of Mauro advanced by the United States is not in any way self-evident. First, the portion of Mauro cited by the United States occurs directly after the Court

-19-

announced the rule that subsequent ad prosequendum writs are to be treated as written requests under the IAD. See Mauro, 436 U.S. at 362-63. We do not believe the portion of Mauro cited by the Government must be read as stipulating a somewhat mysterious and implicit carve out to the rule the Supreme Court had just announced. Rather, it is at least equally plausible to understand the Mauro majority as reaffirming that although states did not historically have the power to ignore federal habeas writs at will and were not granted that power by the IAD, nevertheless, under certain circumstances, what is ostensibly a federal ad prosequendum writ is in effect a request for temporary custody under the IAD, and -- under those circumstances -- subject to the restrictions imposed on such requests.

Second, Mauro's suggestion that a governor lacks the power to reject an ad prosequendum writ acting as a request for temporary custody under the IAD occurs only in a conditional phrase: "If a State has never had authority to dishonor an ad prosequendum writ issued by a federal court, then this provision could not be read as providing such authority." 436 U.S. at 363 (emphasis added). We do not read this conditional language as overriding Mauro's clear holding that an ad prosequendum writ following a detainer is a "request for custody" subject to the IAD. Once the IAD is invoked, it applies in its entirety.

We have on one occasion suggested a contrary result in dicta. See Kenaan, 557 F.2d at 916 n.8. However, Kenaan's dictum, which predates Mauro, has since been superseded by more recent authority. In Currier, we relied on Mauro for the proposition that "once a detainer is lodged against a prisoner, any subsequent writ issued against that same prisoner is a 'written request for temporary custody' under the Agreement." 836 F.2d at 14 (citing Mauro, 436 U.S. at 361-64). We did not rely on Mauro for the proposition that any subsequent ad prosequendum writ is equivalent to a request for temporary custody -- except as to Article IV(a). Our language in Currier was clear and without qualification, and it plainly follows therefrom that subsequent ad prosequendum writs are, qua IAD requests, subject to the sending state's right of refusal under Article IV(a) of the IAD. Although Currier is distinct insofar as the governor in that case did not seek to challenge a subsequent ad prosequendum writ, we nevertheless note that Currier's interpretation of Mauro remains good law in this circuit.

Our result is further borne out by longstanding principles of statutory interpretation. First, we note that the IAD specifically excepts the United States from certain requirements, but not from a governor's right to refuse a transfer. The maxim expressio unius est exclusio alterius comes to mind: in determining the effect of an amendment to existing statutory law,

"[e]xceptions strengthen the force of the general law and enumeration weakens it as to things not expressed."  2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47:23 (7th ed. 2010).  In the context of the IAD, Congress amended the IAD after Mauro to add specific exceptions treating the United States differently from other parties.[7]  Pub. L. No. 100-960, Title VII, § 7059, 102 Stat. 4403 (1988) (codified at 18 U.S.C. App. § 9).  Aside from these enumerated exceptions, though, Congress has stuck with the IAD's definition of the United States as a "state" on the same footing as other receiving states.  See Mauro, 436 U.S. at 354; see also 18 U.S.C. App. § 2, art. II. Because Congress specifically amended the IAD to add these express exceptions, we can safely deduce that Congress did not intend to make any others. See Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188 (1978) (concluding that under maxim expressio unius est exclusio alterius, enumerated exceptions are the only exceptions intended within the Endangered Species Act); see also Alabama v. Bozeman, 533 U.S. 146, 153 (2001) (concluding that "the language of the

---

[7]    For example, if a receiving state other than the United States does not hold a trial before returning the person to the sending state, the "indictment, information or complaint" from the receiving state "shall" be dismissed with prejudice.  18 U.S.C. App. § 2, art. IV(e).  In contrast, under § 9 of the IAD, "Special provisions when United States is a Receiving State," if the United States is the receiving sate, then the dismiss of the "indictment, information or complaint may be with or without prejudice."  18 U.S.C. App. § 9(1) (emphasis added).  Section 9 does not indicate that the United States can disregard or override a sending state's denial of its request for temporary custody.

[IAD] militates against an implicit exception, for it is absolute").

Second, notwithstanding the United States' argument that the IAD's purpose compels deviation from its plain language, it is axiomatic that we must apply the statute as written. See Carchman v. Nash, 473 U.S. 716, 729 (1985) (rejecting an interpretation of the IAD that would elevate its purposes over its plain language); see also Bozeman, 533 U.S. at 153 (noting that in the IAD, as elsewhere, the word "shall" indicates a command). The IAD plainly mandates that a governor be allowed to reject a transfer request, so we must give effect to that command regardless of the statute's stated purpose.[8]

Indeed, in an earlier line of cases, we tried deviating from the IAD's language in order to comport with its purpose, but the Supreme Court abrogated the entire line. See United States v. Kelley, 402 F.3d 39, 42 (1st Cir. 2005) (stating that there can be

_____

[8] The IAD unambiguously states: "there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request." 18 U.S.C. App. § 2, art. IV(a). The United States argues that this thirty-day period has no practical import -- that a prisoner can readily be transferred within the thirty days whether the sending-state governor approves, acquiesces, or disapproves. We reject this interpretation, which would render the mandatory thirty-day period meaningless. See United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

-23-

"no exceptions to finding violations of the IAD for 'technical' or 'de minimis' missteps" and recognizing that <u>Bozeman</u> overruled our earlier contrary holdings); <u>see</u> <u>also</u> <u>Bozeman</u>, 533 U.S. at 152-56. Because the IAD provides that a sending-state governor may refuse to transfer a prisoner, and because Congress specifically excepted the United States from IAD provisions not including this one, the United States must honor a governor's denial of its request.  It is, after all, a request, not an order or a mandate.

One last note remains to be sounded.  The United States has argued that even if Article IV(a) governs <u>ad prosequendum</u> writs issued after invocation of the IAD, nevertheless disapproval of a written request under the IAD "may be premised only upon the requesting sovereign's failure to comply with IAD rules that are designed to safeguard the process and assure that the request is genuine."  The United States insists that Governor Chafee's objection to the transfer of Pleau on grounds of Rhode Island's abhorrence of the death penalty is "not a valid basis" for refusing the request, and that allowing a governor to refuse an IAD request on public policy grounds "would be directly at odds with the IAD's goal of ensuring fast and orderly transfers."  The United States cites no cases in support of this proposition, but rests its argument on the statutory text, which states that a requesting sovereign "<u>shall be entitled</u> to have a prisoner against whom he has

lodged a detainer . . . made available."  18 U.S.C. App. § 2, art. IV(a) (emphasis added).

The United States' textual argument is unconvincing.  It is true that Article IV(a) states that a requesting sovereign "shall be entitled" to have a prisoner made available to him after a detainer has been lodged.  However, the United States neglects to mention that a few lines later, Article IV(a) explicitly qualifies this statement, and states that this is "<u>provided</u> . . . [t]hat there shall be a period of thirty days . . . within which period the Governor of the sending State may disapprove the request for temporary custody or availability."  18 U.S.C. App. § 2, art. IV(a).  <u>See also</u> <u>Mauro</u>, 436 U.S. at 363 n.28 (noting that the IAD retained a governor's right to refuse a transfer request on public policy grounds).  It is uncontroversial that a governor may block a prisoner's transfer to a receiving state other than the United States, and we have already explained why Article IV(a) applies with equal force to the United States.  As to the issue of timeliness, the IAD specifies a thirty-day time frame for a governor to decide whether or not to grant the request, and so long as a decision is rendered in that time frame, it is entirely unclear how it would matter to the speed of a transfer what reason a governor had for accepting or rejecting a transfer request.

The United States' attempt to circumvent the IAD with an <u>ad prosequendum</u> writ weighs in favor of our rejection of its claim

-25-

for physical custody of Pleau.  In RaShad v. Walsh, 300 F.3d 27 (1st Cir. 2002), we held that Massachusetts was negligent in failing to lodge a detainer with Texas after Massachusetts had indicted a Texas prisoner, even though the IAD does not explicitly require a receiving state to lodge a detainer with a sending state. Id. at 37.  We reasoned that "[h]olding otherwise would allow a state to circumvent the IAD with impunity." Id. at 37-38.  We also noted that there was no evidence Massachusetts deliberately tried to circumvent the IAD; therefore, the only import of Massachusetts's failure was to "cut[] in favor of the petitioner's speedy trial claim." Id. at 37.  Here, the United States has gone much further.  It has been seeking an ad prosequendum writ specifically in order to dishonor Governor Chafee's denial of its request for custody, as was his right under the IAD.  If Massachusetts's inadvertent disregard for the IAD hurt its case, the United States certainly cannot base its claim for custody of Pleau on a blatant attempt to sidestep the IAD - a federal law that the United States itself invoked when it filed a detainer with the state of Rhode Island.  The logic of RaShad applies with even greater force where the state (i.e. the United States) in violation of the IAD is the one that invoked it in the first place by filing a detainer.  To grant the United States custody of Pleau "would allow [the United States] to circumvent the IAD with impunity." Id. at 37-38.

-26-

For these reasons, we hold that once the federal government has elected to seek custody of a state prisoner under the IAD, it is bound by that decision. Any subsequent ad prosequendum writ is to be considered a written request for temporary custody under the IAD and, as such, subject to all of the strictures of the IAD, including the governor's right of refusal. The federal government is not required to seek custody under the IAD; it may elect to seek custody by means of a habeas writ. In that case, the Supremacy Clause requires states to conform to the habeas writ. But once the federal government has chosen to proceed under the auspices of the IAD, it may not seek to erase the memory of that decision by means of an ensuing habeas writ.[9]

---

[9] The dissent implies that our result would effectively "empower[] a state governor to veto a federal court habeas writ," which Congress never intended to do. See Diss. Op. at 1. Respectfully, this criticism misapprehends the scope of our holding. We do not hold that a state has a general right to disregard a properly granted ad prosequendum writ; such a broad holding would conflict with the Supremacy Clause and with the Supreme Court's statement in Mauro that "[t]he proviso of Art. IV(a) does not purport to augment the State's authority to dishonor [an ad prosequendum] writ." 436 U.S. at 363. Rather, we hold that in the circumstances present here, the United States gave up its right to seek an ad prosequendum writ. The question is not, as the dissent suggests, what Congress empowered the various states to do; rather, the question is what Congress bound the United States to do. By passing the IAD, Congress obligated the United States to choose either the IAD mechanism or the ad prosequendum mechanism and then accept the consequences of that choice. Thus, when the United States invoked the IAD to gain custody of Pleau, it lost its right to seek an ad prosequendum writ simply because it was dissatisfied with the result of the IAD process. Holding the United States to an agreement that was accepted by Congress neither violates the Supremacy Clause nor upsets the post-Civil War balance of power between the states and the federal government. Contra

## IV. Conclusion

As we have recently noted, prerogative writs such as mandamus and prohibition "are strong medicine and . . . should be dispensed sparingly." In re Sony BMG Music Entm't, 564 F.3d at 4. However, that should not be taken to imply that the writ "has fallen into desuetude." Horn, 29 F.3d at 770 n.20. Indeed, just two years ago, we issued an advisory writ enjoining a district court from broadcasting on the internet a non-evidentiary motions hearing in a copyright infringement case. See In re Sony BMG Music Entm't, 564 F.3d at 9-10. The novel and challenging issues presented in the present case are at least as important. In light of Governor Chafee's exercise of his right of refusal enshrined in Article IV(a) of the IAD, we issue a writ of prohibition

_____

Diss. Op. at 35-36.

Indeed, the federal government may "waive the federal sovereign's strict right to exclusive custody of a prisoner" in favor of state custody. Poland v. Stewart, 117 F.3d 1094, 1098 (9th Cir. 1997) (tracking the language of Ponzi, 258 U.S. at 260). Such a waiver is merely a specific manifestation of the general rule that the federal government may waive its sovereignty, either through executive acts, see, e.g., City of Newark v. United States, 254 F.2d 93, 95 n.1 (3rd Cir. 1958) (citing The Siren, 74 U.S. (7 Wall.) 152, 154 (1868), for the principle that "whenever the United States brings an action as plaintiff, it waives its sovereignty and assumes the status of a private individual for the purposes of counterclaim or defenses"), or legislative acts, see, e.g., United States v. Nordic Village, Inc., 503 U.S. 30, 34 (1992) (noting that the Federal Tort Claims Act creates "sweeping" waiver of federal sovereign immunity). The IAD creates a legislative waiver of federal sovereignty in the prisoner-custody context by defining the federal government as a state, subject to certain exceptions. And to the extent a state acts in accordance with a federal law that includes a waiver of sovereignty, it can hardly be said to offend the Supremacy Clause.

-28-

instructing the parties that the June 30, 2011 writ of habeas corpus <u>ad prosequendum</u> is to be treated in every respect as a written request for temporary custody under the IAD, and that the United States is bound by the IAD's terms, including the governor's right to refuse a transfer request.[10]

**<u>Petition granted.</u>**


**-Dissenting Opinion Follows-**

---

[10] Pleau seeks an interlocutory appeal in addition to or alternatively to the writ of prohibition.  Because we issue the writ, we need not address Pleau's request for interlocutory review.

**BOUDIN, <u>Circuit Judge</u>, dissenting.** Congress would surely be surprised to be told that it had empowered a state governor to veto a federal court habeas writ--designed to bring a federally indicted prisoner to federal court for trial on federal charges-- because the governor opposed the penalty that might be imposed if a federal conviction resulted. Of course, Congress has not provided states with any such veto power, and the Supreme Court has already made this clear in <u>United States</u> v. <u>Mauro</u>, 436 U.S. 340 (1978).

A federal grand jury indicted Jason Pleau on December 14, 2010, charging him with federal felonies[11] related to the September 20, 2010, robbery and murder of a gas station manager making a bank deposit in Woonsocket, Rhode Island. Pleau was in Rhode Island state custody on parole violation charges when the indictment came down, and is now serving an 18-year sentence there for parole and probation violations.

To secure Pleau's presence in the federal prosecution, the federal government invoked the Interstate Agreement on Detainers Act ("IAD"). Pub. L. No. 91-358, 84 Stat. 1397 (1970) (codified as amended at 18 U.S.C. app. 2 § 2 (2006)). The IAD provides what is supposed to be an efficient shortcut to achieve

---

[11] Conspiracy to commit robbery affecting commerce, 18 U.S.C. § 1951(a) (2006), robbery affecting commerce, <u>id.</u>, and use of a firearm during and in relation to a crime of violence resulting in death, <u>id.</u> § 924(c)(1)(A), (j)(1).

extradition of a state prisoner to stand trial in another state or, in the event of a federal request, to make unnecessary the prior custom of a federal habeas action to secure the state prisoner for a federal prosecution. See IAD art. I. In this instance, Rhode Island's governor refused the IAD request because of his stated opposition to capital punishment. United States v. Pleau, No. 10-184-1S, 2011 WL 2605301, at *2 n.1 (D.R.I. June 30, 2011).

The federal government then sought a writ of habeas corpus ad prosequendum from the district court to secure custody of Pleau--this being the traditional method by which a federal court obtained custody in such situations. E.g., Carbo v. United States, 364 U.S. 611, 615-16, 618 (1961). The federal habeas statute codifying this common law practice authorizes the writ to be issued by a federal court to secure a person, including one held in state custody, where "necessary to bring him into [federal] court to testify or for trial." 28 U.S.C. § 2241(c)(5) (2006). This habeas statute, currently in force, long predated the IAD, Carbo, 364 U.S. at 614-19.

Pursuant to the habeas statute, the federal district court in Rhode Island ordered Pleau to be delivered into federal custody. Pleau, 2011 WL 2605301, at *4. Pleau, who at that stage had no standing under existing precedent to challenge the writ,[12]

_____

[12] E.g., Weekes v. Fleming, 301 F.3d 1175, 1180 n.4 (10th Cir. 2002), cert. denied, 537 U.S. 1146 (2003); Weathers v. Henderson, 480 F.2d 559, 559-60 (5th Cir. 1973) (per curiam); Derengowski v.

-31-

nevertheless appealed and petitioned this court for a writ of prohibition to bar the district court from enforcing the habeas writ. Over a dissent, the panel majority granted a stay of the habeas writ and Pleau remains today in state custody many months after the government first sought his appearance in federal court. Unless he is produced, he cannot be tried on the federal charges.

An expedited appeal followed in which the Rhode Island governor was granted belated intervention. The panel majority has now held that the state's refusal to grant consent under the IAD effectively disables as well the grant of the subsequently filed traditional habeas corpus ad prosequendum writ. This conclusion is remarkable both because Mauro held that lack of state consent would not affect the force of the habeas writ vis-à-vis the state and because it effectively thwarts a federal prosecution authorized by the United States Attorney and a federal grand jury.

Were the panel's position to prevail, Pleau could be permanently immune from federal prosecution. He is currently serving an 18-year term in Rhode Island prison and, if exempted now from answering the federal charges in the district court, could well agree to a life sentence under Rhode Island law for the robbery and murder. See Br. for Amicus Curiae Governor Lincoln D.

---

U.S. Marshal, Minneapolis Office, Minn. Div., 377 F.2d 223, 223-24 (8th Cir.), cert. denied, 389 U.S. 884 (1967); United States v. Horton, No. 95-5880, 1997 WL 76063, at *3 (4th Cir. Feb. 24, 1997) (per curiam) (unpublished).

Chafee in Support of Pet'r Ex. A (letter from Pleau to Rhode Island Assistant Attorney General offering to plead to sentence of life without parole on state charges). Even if the term remains at 18 years, one could hardly count on necessary witnesses being available for federal prosecution two decades from now. Instead of a place of confinement, the state prison has been made a refuge against the federal courts.

To reach this result, the panel majority has circumvented standing limitations on the power of a defendant to challenge the writ, see note 12, above, as well as ordinary practice generally reserving prohibition and mandamus writs for clear error by the district court. E.g., In re City of Fall River, Mass., 470 F.3d 30, 32 (1st Cir. 2006). But, passing all that, on the core issue the panel decision adopts a reading of the federal statutes that disregards an explicit contrary determination by the Supreme Court in United States v. Mauro, 436 U.S. 340 (1978), on the relationship between the writ and the IAD.

Mauro disposed of two different federal appeals but, in the one most pertinent to Pleau, the background is easily summarized. The federal government lodged a detainer with state prison authorities, and then summoned the defendant from state prison to federal court by habeas writ, first for arraignment and (after many postponements) then for trial. The defendant repeatedly objected that he was being denied the speedy trial

-33-

rights expressly protected by Article IV(c) of the IAD once its procedures have been invoked. 436 U.S. at 345-48.

After the defendant's federal conviction, the circuit court held that he had indeed been denied the speedy trial protections of the IAD, requiring dismissal of the federal indictment with prejudice. The Supreme Court agreed, saying that the detainer had triggered the IAD and the habeas writ comprised a "written request" for initiating a transfer contemplated by Article IV of the IAD. Mauro, 436 U.S. at 361-64. The fact that the writ had been used as part of the IAD process, the Court held, did not negate the IAD's express time limitations and sanction for ignoring them.

The Court went on, however, to expressly reject the suggestion that a state governor could resist a writ of habeas corpus by withholding consent to the transfer of a state prisoner to federal court. Indeed, the Court distinguished between the time limits of Article IV(c) triggered by the detainer and Article IV(a)'s reservation of the governor's power to withhold consent. The former represented Congress' concern about delays in the IAD procedure, which could adversely affect the defendant subject to the detainer, whether invoked by the federal government or a state.

By contrast, the latter reservation merely preserved for the holding state its traditional authority to refuse an extradition request from another state, Mauro, 436 U.S. at 363 &

-34-

n.28; it did not curtail whatever authority the writ traditionally gave the federal court to insist on the production of a defendant contrary to the wishes of the state.  In fact, in Mauro the federal government had argued that applying the time limits to it could allow a governor to invoke Article IV's consent provision to a federal writ used after a detainer had been filed.  The Court answered:

> We are unimpressed.  The proviso of Art. IV(a) does not purport to augment the State's authority to dishonor such a writ.  As the history of the provision makes clear, it was meant to do no more than preserve previously existing rights of the sending States, not to expand them.  If a State has never had authority to dishonor an ad prosequendum writ issued by a federal court, then this provision could not be read as providing such authority.

Id. at 363 (internal footnote omitted).

That "a state has never had authority to dishonor an ad prosequendum writ issued by a federal court" is patent.  The habeas writ has been codified by Congress, and under the Supremacy Clause, U.S. Const. art. VI, cl. 2, Congress' power trumps any contrary position or preference of the state.  This principle has been regularly and famously used to compel states, including their governors, to respect orders of federal courts in civil rights cases such as Cooper v. Aaron, 358 U.S. 1, 18-19 (1958), and United States v. Barnett, 376 U.S. 681 (1964).[13]  State interposition to

---

[13]  And this fundamental tenet of constitutional law is, of course, not confined to the civil rights context.  E.g., Puerto Rico v.

defeat federal authority is a doctrine that was thought to have vanished with the Civil War.  E.g., Gonzales v. Raich, 545 U.S. 1, 29 (2005).

That the federal statutory habeas ad prosequendum writ overrides any state power to withhold the defendant has been affirmed by three circuits with which the panel majority now conflicts.  United States v. Graham, 622 F.2d 57, 59 (3d Cir.), cert. denied, 449 U.S. 904 (1980); United States v. Bryant, 612 F.2d 799, 802 (4th Cir. 1979), cert. denied, 446 U.S. 919 (1980); Tranfy v. United States, 311 F. App'x 92, 95-96 (10th Cir. 2009) (unpublished).  A Second Circuit dictum, United States v. Scheer, 729 F.2d 164, 170 (2d Cir. 1984), to the extent it suggests otherwise, was properly criticized as a misreading of Mauro.  Id. at 172 (Kearse, J., concurring).

Mauro did not hold, as the panel majority supposes, that the filing of a detainer with state authorities disempowers the habeas writ or gives the governor a veto over its use; the Court, in the indented passage quoted above, said exactly the opposite.  Nor do general canons of construction allow a lower court panel majority to disregard the Supreme Court's own construction of the IAD, namely, that "[t]he proviso of Art. IV(a) does not purport to

_____

Branstad, 483 U.S. 219, 227-29 (1987); Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 695-96 (1979); Sterling v. Constantin, 287 U.S. 378, 397-98 (1932); Ex Parte Young, 209 U.S. 123, 167-68 (1908).

augment the State's authority to dishonor such a writ."  436 U.S. at 363.

Here, a valid writ has been approved by a federal district court but is now effectively dishonored by the state and by the panel majority's writ of prohibition declaring that the governor is entitled to disregard the writ.  <u>Mauro</u> is plainly to the contrary, and the panel majority's action cannot survive the inevitable further review now fated for it.