# United States Court of Appeals
## For the First Circuit

No. 11-1775

UNITED STATES OF AMERICA,

Appellee,

v.

JASON W. PLEAU

Defendant, Appellant.
_____

LINCOLN D. CHAFEE, in his capacity as
Governor of the State of Rhode Island,

Intervenor.
_____

No. 11-1782

IN RE: JASON WAYNE PLEAU,

Petitioner.
_____

LINCOLN D. CHAFEE, in his capacity as
Governor of the State of Rhode Island,

Intervenor.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND and
PETITION FOR A WRIT OF PROHIBITION

[Hon. William E. Smith, U.S. District Judge]
_____

Before
Lynch, Chief Judge,
Torruella, Boudin, Howard and Thompson, Circuit Judges.
_____

Claire Richards, Executive Counsel, for intervenor.

William F. Cavanaugh, Daniel Ruzumna, Joshua A. Goldberg, Jason S. Gould, Muhammad U. Faridi, Christopher M. Strong, Catherine E. Geddes and Patterson Belknap Webb & Tyler LLP on brief for National Governors Association and Council of State Governments, Amici Curiae.

Matthew L. Fabisch on brief for the Stephen Hopkins Center for Civil Liberties, Amicus Curiae.

Robert B. Mann, by appointment of the court, with whom Mann & Mitchell, David P. Hoose, by appointment of the court, and Sassoon, Turnbull & Hoose, were on supplemental brief for petitioner.

Anthony D. Mirenda, Daniel N. Marx, Jennifer S. Behr, Eric A. Haskell, Foley Hoag LLP, Carolyn A. Mannis, Rhode Island ACLU, Zachary L. Heiden, ACLU of Maine, Barbara A. Keshen, New Hampshire Civil Liberties Union, Joshua L. Dratel, National Association of Criminal Defense Lawyers, Juan F. Matos de Juan, Colegio de Abogados de Puerto Rico, William Ramirez, ACLU of Puerto Rico, John Reinstein, ACLU of Massachusetts, Judith H. Mizner, Office of the Federal Defender, Prof. Andres Horwitz, Rhode Island Association of Criminal Defense Lawyers, on brief for Rhode Island ACLU; ACLU of Puerto Rico; ACLU of Maine; ACLU of Massachusetts; New Hampshire Civil Liberties Union; Office of the Federal Defender for the Districts of Rhode Island, Massachusetts and New Hampshire; National Association of Criminal Defense Lawyers; Rhode Island Association of Criminal Defense Lawyers; and Colegio de Abogados de Puerto Rico, Amici Curiae.

Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief for appellee.

———————————

May 7, 2012

———————————

OPINION EN BANC

**BOUDIN, Circuit Judge.** A federal grand jury indicted Jason Pleau on December 14, 2010, for crimes related to the September 20, 2010, robbery and murder of a gas station manager making a bank deposit in Woonsocket, Rhode Island. 18 U.S.C. §§ 2, 1951(a) (robbery affecting commerce); id. § 1951(a) (conspiring to do the same); id. § 924(c)(1)(A), (j)(1) (use of a firearm during and in relation to a crime of violence resulting in death). The federal prosecutor could seek the death penalty but that decision depends on U.S. Attorney General approval after a lengthy process. See, e.g., United States v. Lopez-Matias, 522 F.3d 150, 155 (1st Cir. 2008).

Pleau was in Rhode Island state custody on parole violation charges when the federal indictment came down, and is now serving an 18-year sentence there for parole and probation violations. To secure Pleau's presence in federal court, the federal government invoked the Interstate Agreement on Detainers Act ("IAD"), Pub. L. No. 91-538, 84 Stat. 1397 (1970) (codified as amended at 18 U.S.C. app. 2 § 2). The IAD provides what is supposed to be an efficient shortcut to achieve extradition of a state prisoner to stand trial in another state or, in the event of a federal request, to make unnecessary the prior custom of a federal habeas action. See IAD art. I.

In this instance, Rhode Island's governor refused the IAD request because of his stated opposition to capital punishment.

<u>United States</u> v. <u>Pleau</u>, No. 10-184-1S, 2011 WL 2605301, at *2 n.1 (D.R.I. June 30, 2011). The federal government then sought a writ of habeas corpus <u>ad prosequendum</u> from the district court to secure custody of Pleau--this being the traditional method by which a federal court obtained custody. <u>E.g.</u>, <u>Carbo</u> v. <u>United States</u>, 364 U.S. 611, 615-16, 618 (1961). Codifying common law practice, the statute authorizing the writ empowers a federal court to secure a person, including one held in state custody, where "necessary to bring him into [federal] court to testify or for trial." 28 U.S.C. § 2241(c)(5).

Pursuant to the habeas statute, the federal district court in Rhode Island ordered Pleau to be delivered into federal custody to answer the federal indictment. <u>Pleau</u>, 2011 WL 2605301, at *4. Pleau both appealed and, in the alternative, petitioned this court for a writ of prohibition to bar the district court from enforcing the habeas writ. A duty panel of this court, over a dissent, stayed the habeas writ, and an expedited appeal followed in which the Rhode Island governor was granted belated intervention. Ultimately, the same panel, again over a dissent, held in favor of Pleau and the governor.

On petition of the federal government, the full court granted rehearing en banc; the en banc court vacated the panel decision but left the stay in effect until resolution of the en banc proceeding. We consider first the propriety of review of the

-4-

district court's grant of the writ given that the federal criminal case against Pleau remains pending. Piecemeal appellate review of trial court decisions is--with few, narrowly interpreted exceptions--not permitted, especially in criminal cases. United States v. Kane, 955 F.2d 110, 110-11 (1st Cir. 1992) (per curiam).

Nevertheless, we need not wander into the thicket of Pleau's own debatable standing to appeal from a writ merely commanding his presence to answer criminal charges,[1] nor explore the possible use of the "collateral order" doctrine to rescue the interlocutory appeal. Governor Chafee, in an order not disturbed by the grant of the en banc rehearing petition, was allowed to intervene. And as a party to the case, he is entitled to argue for an advisory writ of prohibition, which suffices to bring the merits of the dispute to us for resolution.

While writs of mandamus and prohibition--two sides of the same coin with interchangeable standards, United States v. Horn, 29 F.3d 754, 769 n.18 (1st Cir. 1994)--are generally limited to instances of palpable error threatening irreparable harm, e.g., In re Pearson, 990 F.2d 653, 656 & n.4 (1st Cir. 1993), "advisory mandamus" is available in rare cases; the usual requisites are that

---

[1]E.g., Weekes v. Fleming, 301 F.3d 1175, 1180 n.4 (10th Cir. 2002), cert. denied, 537 U.S. 1146 (2003); Weathers v. Henderson, 480 F.2d 559, 559-60 (5th Cir. 1973) (per curiam); Derengowski v. U.S. Marshal, Minneapolis Office, Minn. Div., 377 F.2d 223, 223-24 (8th Cir.), cert. denied, 389 U.S. 884 (1967); United States v. Horton, No. 95-5880, 1997 WL 76063, at *3 (4th Cir. Feb. 24, 1997) (per curiam) (unpublished).

the issue be an unsettled one of substantial public importance, that it be likely to recur, and that deferral of review would potentially impair the opportunity for effective review or relief later on.  Horn, 29 F.3d at 769-70.

A state's refusal to honor a federal court writ is surely a matter of importance; and, if they could, states would certainly mount more such challenges.  Whether Pleau would be prejudiced if review now were refused is less clear; but the governor could hardly obtain meaningful relief following a federal conviction of Pleau.  And neither the federal government nor the other parties dispute that the issue can be considered on advisory mandamus.  So we turn to the merits, which present two interrelated but sequential questions.

The first is whether the IAD statute precludes the federal government's use of the habeas writ, after a detainer has been filed and an initial IAD request has been rejected, to convert a request into a command.  The second question is whether in such a case the habeas statute compels the state governor to deliver the prisoner or whether compliance is merely a matter of comity that the governor may withhold.  This is the way the Supreme Court structured the issues in United States v. Mauro, 436 U.S. 340 (1978), which resolves the first question and frames the second in a way that clearly dictates the answer.

-6-

Of two different federal appeals disposed of by Mauro, only one is directly pertinent to Pleau. The federal government invoked the IAD by lodging a detainer with state prison authorities so that the defendant charged with federal crimes would not be released without notice; and the prosecutor then summoned the defendant from state prison by habeas writ, first for arraignment and (after many postponements) then for trial. The defendant objected that he was being denied the speedy process required by Article IV(c) of the IAD. 436 U.S. at 345-48.

After the defendant's federal conviction, the circuit court held that the deadlines prescribed by the IAD had been breached, requiring (under explicit provisions of the IAD) dismissal of the federal indictment with prejudice. The Supreme Court agreed, saying that the detainer had triggered the IAD and that the habeas writ comprised a "written request" for initiating a transfer contemplated by Article IV of the IAD. Mauro, 436 U.S. at 361-64. That the writ had been used as part of the IAD process did not negate the IAD's express time limitations and sanction for ignoring them. Id.

However, Mauro went on to reject the suggestion that, if the Court upheld the time limit on the IAD proceeding, a state governor could in some other case frustrate a writ of habeas corpus by refusing to surrender a prisoner to federal court. Instead, the Court distinguished between the time limits of Article IV(c)

-7-

triggered by the detainer and Article IV(a)'s reservation of the governor's power to withhold consent. <u>Mauro</u>, 436 U.S. at 363-64. The time limits, it said, had been accepted by the federal government when it invoked the IAD procedures. <u>Id.</u> at 364.

By contrast, the Court held, the consent reservation merely preserved for holding states any pre-existing authority they had to refuse requests, <u>Mauro</u>, 436 U.S. at 363 & n.28; it did not curtail whatever authority the habeas writ traditionally gave the federal court to insist on the production of a defendant contrary to the wishes of the state. The Court responded to the federal government's concern that a decision in favor of Mauro would allow a governor to refuse a habeas writ:

> We are unimpressed. The proviso of Art. IV(a) does not purport to augment the State's authority to dishonor such a writ. As the history of the provision makes clear, it was meant to do no more than preserve previously existing rights of the sending States, not to expand them. <u>If a State has never had authority to dishonor an ad prosequendum writ issued by a federal court, then this provision could not be read as providing such authority</u>.

<u>Id.</u> at 363 (internal footnote omitted and emphasis added).

This limiting passage was part of the Court's balanced reading of the IAD and, in answering a substantive objection to the Court's treatment of the IAD's time limits as binding on the federal government, was not dicta but part of the Court's rationale for its holding. And in saying that state authority to withhold the prisoner was not augmented beyond whatever had existed before

-8-

the IAD, Mauro was saying that a habeas writ--even though it followed a detainer--retained its pre-IAD authority to compel a state to surrender a prisoner.

That Article IV(a)'s proviso was not intended to give governors a veto power operative against the federal government is borne out by a telling piece of background indicating that it was concerned with the pre-IAD rules of extradition as between individual states;[2] the federal government, by contrast, proceeded prior to the IAD not by extradition but by use of habeas. But the proper construction of Article IV(a) is not open to debate here: under Mauro, its proviso cannot be read as "providing . . . authority" that the states had previously lacked. 436 U.S. at 363.

That "a state has never had authority to dishonor an ad prosequendum writ issued by a federal court" is patent. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the habeas statute--like any other valid federal measure--overrides any contrary position or preference of the state, a principle regularly and famously reaffirmed in civil rights cases, e.g., Cooper v. Aaron, 358 U.S. 1, 18-19 (1958); United States v. Barnett, 376 U.S. 681

---

[2]The report of the Council of State Governments, which drafted the IAD and urged its adoption on the states and federal government, Mauro, 436 U.S. at 350-51, explained: "The possibility [of the Governor withholding consent] is left open merely to accommodate situations involving public policy which occasionally have been found in the history of extradition." Council of State Gov'ts, Suggested State Legislation Program for 1957, at 79 (1956) (emphasis added).

(1964), as in many other contexts, e.g., Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 695-96 (1979).  State interposition to defeat federal authority vanished with the Civil War.

Pleau and Governor Chafee cite a miscellany of old circuit-court statements that a demand by a federal court for a state prisoner depends upon comity,[3] but these cases misread a 1922 Supreme Court case, Ponzi v. Fessenden, 258 U.S. 254, 260-62 (1922); Ponzi, referring generally to principles of comity, held that the federal government through the Attorney General could choose, as a matter of comity on its side, to deliver a federal prisoner for trial on state charges.  Id. at 262.  Ponzi neither held nor said that a state governor may invoke comity principles to disobey a federal court habeas writ.

None of these circuit cases cited by Pleau and the governor presented a litigated controversy between the United States and a state over the enforcement of a federal writ.  To the extent not dicta or brief asides, such cases involved odd situations such as attempts by federal criminal defendants to obtain the presence of co-defendants held in state prisons.  In all events, these cases cite Ponzi (or other circuit cases relying on

---

[3] See, e.g., McDonald v. Ciccone, 409 F.2d 28, 30 (8th Cir. 1969); Stamphill v. Johnston, 136 F.2d 291, 292 (9th Cir.), cert. denied, 320 U.S. 766 (1943); Lunsford v. Hudspeth, 126 F.2d 653, 655 (10th Cir. 1942).

Ponzi), which simply had nothing to do with a federal court's order to a state.

The Supremacy Clause operates in only one direction and has nothing to do with comity: it provides that Congress' enactments are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. That there is an overriding federal interest in prosecuting defendants indicted on federal crimes needs no citation, and the habeas statute is an unqualified authorization for a federal court to insist that a defendant held elsewhere be produced for proceedings in a federal court.

This court earlier said that we were "confident that the writ would be held enforcible" over a state's contrary preference. United States v. Kenaan, 557 F.2d 912, 916 n.8 (1st Cir. 1977); accord United States v. Graham, 622 F.2d 57, 59 (3d Cir.), cert. denied, 449 U.S. 904 (1980); United States v. Bryant, 612 F.2d 799, 802 (4th Cir. 1979), cert. denied, 446 U.S. 919 (1980); Tranfy v. United States, 311 F. App'x 92, 95-96 (10th Cir. 2009) (unpublished).[4] A contrary Second Circuit dictum, United States v.

---

[4]Yet another circuit, while noting that Mauro's conditional language left the ultimate issue open, observed: "We would have thought that, under the Supremacy Clause, a state was not free to delay or disapprove compliance with the writ executed under federal statutory authority . . . ." United States v. Hill, 622 F.2d 900, 907 & n.18 (5th Cir. 1980).

<u>Scheer</u>, 729 F.2d 164, 170 (2d Cir. 1984), was properly described as a misreading of <u>Mauro</u>. <u>See</u> <u>id.</u> at 172 (Kearse, J., concurring).

As a fallback, Pleau and Governor Chafee say that even if today courts would all agree that the Supremacy Clause trumps a state's refusal to honor the writ, Congress--to borrow a phrase-- "captured in amber" the misguided notion from old (but erroneous) circuit precedent that honoring the federal writ is a matter of state comity. There is, of course, nothing to suggest that Congress was remotely aware of these decisions; and, as already noted (<u>see</u> note 2, above), what legislative history exists shows that the consent provision was concerned with one state's effort to extradite a prisoner held by another and the possible need for consent.

Even without such history, the construction offered fails the test of common sense. One can hardly imagine Congress, whether in approving the IAD or at any other time, empowering a state governor to veto a federal court habeas writ--designed to bring a federally indicted prisoner to federal court for trial on federal charges--because the governor opposed the federal penalty that might be imposed if a conviction followed. If we were now determining Congress' intent afresh, the improbability of such an intention would be apparent.

But, once again, this court cannot disregard <u>Mauro</u> and and construe the consent provision as if it were an open issue;

-12-

canons of construction, interpretive rules for compacts, and conjectures about whether Congress held mistaken views at the time of the IAD's adoption are all beside the point. Mauro said that "[i]f a State has never had authority to dishonor an ad prosequendum writ issued by a federal court, then [the consent provision] could not be read as providing such authority." 436 U.S. at 363. Given the Supremacy Clause, the states have always lacked that authority.

Were Pleau and Governor Chafee to prevail, Pleau could be permanently immune from federal prosecution, and the use of the efficient detainer system badly compromised. He is currently serving an 18-year term in Rhode Island prison and, if the writ were denied, might agree to a state sentence of life in Rhode Island for the robbery and murder.[5] Even if Pleau served only his current 18-year term, needed witnesses for federal prosecution could be unavailable two decades from now. Instead of a place of confinement, the state prison would become a refuge against federal charges. Mauro forbids such a result.

The writ of prohibition is denied and the stay of the habeas writ is vacated.

It is so ordered.

**-Dissenting Opinion Follows-**

---

[5]See Brief for Amicus Curiae Governor Lincoln D. Chafee in Support of Pet'r Ex. A (letter from Pleau to Rhode Island Assistant Attorney General offering to plead to sentence of life without parole on state charges).

-13-

TORRUELLA, _Circuit Judge_, with whom THOMPSON, _Circuit Judge_, joins, dissenting._ I am compelled to dissent because in reaching its announced result, the majority fails to follow the express terms of the Interstate Agreement on Detainers Act,[6] snubs the rules applicable to the enforcement of interstate compacts as reiterated most recently by the Supreme Court,[7] and compounds these errors by misconstruing the holding in _United States_ v. _Mauro_, 436 U.S. 340 (1978).  As the Supreme Court has stated multiple times, federal courts should not "'order relief inconsistent with [the] express terms' of a compact, 'no matter what the equities of the circumstances might otherwise invite.'"  _Alabama_ v. _North Carolina_, 130 S. Ct. 2295, 2313 (2010) (quoting _New Jersey_ v. _New York_, 523 U.S. 767, 811 (1998)).  Yet with its ruling, the majority has done exactly what the Supreme Court said courts must not do: it has ordered relief plainly inconsistent with the express terms of the Interstate Agreement on Detainers ("IAD" or "Agreement") based on its own misguided view of the equities of the circumstances of this case.

There is no dispute that the United States is a party to the IAD.  Furthermore, the IAD's plain language and history make clear that the United States is bound by <u>all</u> of its provisions.

---

[6]Pub. L. No. 91-538, 84 Stat. 1397 (1970) (codified as amended at 18 U.S.C. app. 2 § 2).

[7]_Alabama_ v. _North Carolina_, 130 S. Ct. 2295 (2010).

-14-

One of those provisions, Article IV(a), provides that a State may request custody over a prisoner from another State by sending a "written request for temporary custody or availability"; however, Article IV(a) also gives the Governor of the State from which custody is requested the right to refuse such a request. Under the Supreme Court's holding in Mauro, once the United States (or any other State) invokes the IAD by lodging a detainer against a prisoner, any subsequently-filed writ of habeas corpus ad prosequendum is treated as a "written request for temporary custody and availability" under the IAD. See 436 U.S. at 351-52.

Applying the aforementioned principles to the facts of this case, the proper result is clear. The United States invoked the IAD when it lodged a detainer against Jason Wayne Pleau ("Pleau"). Because the United States invoked the IAD, the writ of habeas corpus ad prosequendum granted by the district court must, under Mauro, be treated as a request for custody under the IAD. Therefore, the Governor of Rhode Island had the right under the IAD to refuse the request. The majority avoids this result only by manufacturing a Supremacy Clause issue where none exists and by misinterpreting Mauro.

-15-

**I.**

There is no question that the IAD is an interstate compact[8] among the United States and 48 other States. "[E]ven the Government concedes[] [that] the Agreement as enacted by Congress expressly includes the United States within the definition of 'State.'" Mauro, 436 U.S. at 354. As further stated in Mauro, "[t]he [IAD] statute itself gives no indication that the United States is to be exempted from the category of receiving States. To the contrary, [Article] VII states that 'this agreement shall enter into full force and effect as to a party State when such State has enacted the same into law.'" Id. at 354 (alterations omitted). "[T]here is no indication whatsoever that the

_____

[8]As such it was enacted pursuant to the Compact Clause. U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the consent of Congress . . . enter into any Agreement or Compact with another State . . . ."). Congress originally granted its consent for various States to enter into the IAD by enacting the Crime Control Act of 1934, 48 Stat. 909. See Cuyver v. Adams, 449 U.S. 433, 441 (1981). In 1970, Congress caused the District of Columbia and the United States itself to join the IAD by enacting the Interstate Agreement on Detainers Act. See Mauro, 436 U.S. at 343. The congressional approval of this interstate compact transformed the compact into federal law. Cuyver, 449 U.S. at 438. An interstate compact that requires congressional approval, such as the IAD, needs this approval because consent by the United States must be given before there can be an "encroach[ment] or interfer[ence] with the just supremacy of the United States." Id. at 440 (citations omitted). There should thus be no question that in entering into the IAD as an equal "State," Mauro, 436 U.S. at 354, the United States was, for purposes of the subject matter of the IAD, relinquishing any superior sovereign rights that may have preexisted the Agreement.

-16-

participation of the United States was to be a limited one."  Id. at 355.

The consequence of Congress's deliberate adoption of the IAD is that "the United States is bound by the Agreement when it activates its provisions by filing a detainer against a state prisoner and then obtains his custody by means of a writ of habeas corpus ad prosequendum."  Id. at 349.  In the present case, the United States activated the provisions of the IAD -- and thus bound itself to the IAD's terms -- by lodging a detainer against Pleau, who at the time was serving an 18-year prison sentence in the custody of the State of Rhode Island for parole violations.  The detainer filed by the United States was related to a federal indictment issued for alleged federal crimes involving the same acts that were the subject of state-law charges pending in Rhode Island at the time.[9]

After lodging the detainer, the United States sent a request for custody to Rhode Island.  The Governor of Rhode Island,

_____

[9]Pleau is presently serving an 18 year sentence of imprisonment for parole and probation violations in Rhode Island. He agreed to plead guilty to the state crimes for which he was charged and to accept a sentence of life imprisonment without the possibility of parole. See Br. for Amicus Curiae Governor Lincoln S. Chafee in Support of Pet'r, Ex. A (letter from Pleau to Rhode Island Assistant Attorney General offering to plead to sentence of life without parole on state charges).  After Pleau agreed to the plea and sentence, but before the United States first requested custody of Pleau, the Rhode Island Attorney General dismissed the charges against Pleau without prejudice.  See Katie Mulvaney, Faceoff Looms Over Suspect; Courts, Providence Journal, June 28, 2011, at 1.

-17-

Lincoln Chafee ("Governor Chafee" or the "Governor"), invoking his authority under Article IV(a) of the IAD, refused to surrender Pleau to the federal authorities. Governor Chafee cited state public policy grounds for his rejection, namely Rhode Island's longstanding opposition to the death penalty as an appropriate punishment, a penalty to which Pleau would be exposed if convicted on federal charges.

Undeterred by the Governor Chafee's refusal, the United States then proceeded to attempt an end run around its commitments under the IAD by seeking the production of Pleau pursuant to a writ of habeas corpus ad prosequendum. The district court granted the writ, but a duty panel of this court (with one dissent) stayed its execution pending Pleau's appeal, and Governor Chafee later intervened. The same panel (again with one dissent), pursuant to advisory mandamus, issued a writ of prohibition enforcing Governor Chafee's right to refuse to transfer Pleau. See United States v. Pleau, 662 F.3d 1 (1st Cir. 2011).

The panel noted Mauro's holding that "'once a detainer has been lodged' . . . 'it clearly would permit the United States to circumvent its obligations under the [IAD] to hold that an ad prosequendum writ may not be considered a written request for temporary custody.'" Pleau, 662 F.3d at 10 (quoting Mauro, 436 U.S. at 362). Based on this clear statement from Mauro, the panel held that

-18-

> once the federal government has elected to seek custody of a state prisoner under the IAD, it is bound by that decision. Any subsequent <u>ad prosequendum</u> writ is to be considered a written request for temporary custody under the IAD and, as such, subject to all of the strictures of the IAD, including the governor's right of refusal.

<u>Pleau</u>, 662 F.3d at 12.

As alluded to, the <u>en banc</u> majority rejects this outcome, denies the writ of prohibition, and vacates the stay of the execution of the habeas writ. The substance[10] of the majority's opinion is, first of all, that <u>Mauro</u> "reject[ed] the suggestion that, if the Court upheld the time limit on the IAD proceeding [under Article IV(c)], a state could in some other case frustrate a writ of habeas corpus by refusing to surrender a prisoner to federal court." Maj. Op. at 7. According to the majority's opinion, the Court "merely preserved for the holding states any pre-existing authority they had to refuse requests." <u>Id.</u> at 8. The majority next contends that it "is patent" that Rhode Island lacks authority "to dishonor an <u>ad prosequendum</u> writ issued by a federal court . . . [by virtue of] the Supremacy Clause, U.S. Const. art. VI, cl. 2." <u>Id.</u> at 9.[11] The majority then posits a

---

[10]For present purposes I deem it unnecessary to discuss the preliminary and procedural matters referred to in the first five pages of the majority's opinion.

[11]The Supremacy Clause, U.S. Const. art. VI, cl. 2, provides: "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the

-19-

catch-all ratiocination, pursuant to which it concludes that Rhode Island's arguments "fail[] the test of common sense," id. at 11. Lastly, as a sequel to this argument, it proceeds to adopt the Government's scenario of inevitable horribles which allegedly will follow if the United States is made to comply with what it agreed to as a signatory State under the IAD. Id. at 13.

With respect, I find all of these arguments flawed.

## II.

We first turn to the Supremacy Clause argument, the recurrent "Big Brother" argument that is used by the federal government when it attempts to push its weight against the States. In this case it is only one of several smoke screens behind which the majority attempts to shield the weakness of the Government's position, and it is the most baseless of all the reasons given for overturning the panel opinion.

The majority states that "[u]nder the Supremacy Clause . . . the habeas statute -- like any other valid federal measure -- overrides any contrary position or preference of the state . . . ." Maj. Op. at 9. However, this statement is a red herring. Again, as recently stated by the Supreme Court in Alabama v. North Carolina, "an interstate compact is not just a contract; it is a federal statute enacted by Congress." 130 S. Ct. at 2312

---

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

-20-

(emphasis added).  See also n.3, ante.  Thus, the issue presented is not, as framed by the majority, one of conflict between a federal law and Rhode Island's contrary position or preference. Rather, because the IAD is a <u>federal</u> <u>statute</u>, just like the habeas statute is a <u>federal</u> <u>statute</u>, the issue here is how two <u>federal</u> <u>statutes</u> interact, a determination in which the Supremacy Clause plays no part.  That question is answered by reading both federal laws and by determining, in the first place, whether there is any conflict that arises from reading the plain language of each statute.  As will be presently discussed, there is nothing in the habeas corpus statute as presently articulated, or any of its predecessors going back to the Judiciary Act, that supercedes, contravenes, or downgrades the provisions of the IAD <u>vis-a-vis</u> the habeas corpus legislation.[12]

The federal habeas corpus writ was first authorized to be issued by federal courts pursuant to Section 14 of the Judiciary

---

[12]For this reason, the cases the majority refers to in which the Supremacy Clause was invoked to enforce treaties or Federal civil rights laws in the face of non-compliance by States are completely inapposite.  <u>See</u> Maj. Op. at 8-9.  This is not a case involving "State interposition to defeat federal authority."  <u>Id.</u> at 9.  This is a case in which a State governor exercised a right <u>expressly</u> given to him by <u>federal</u> law.  As noted in the panel majority opinion, "the federal government may 'waive the federal sovereign's strict right to exclusive custody of a prisoner' in favor of state custody."  <u>Pleau</u>, 662 F.3d at 13 n.9 (quoting <u>Poland</u> v. <u>Stewart</u>, 117 F.3d 1094, 1098 (9th Cir. 1997)).  This is precisely what the United States did by joining the IAD and invoking it in Pleau's case.  The Supremacy Clause is not even implicated, much less violated, when the United States <u>voluntarily</u> waives its right to custody in favor of a State.

Act of 1789.[13] Since then habeas corpus practice has been formalized into a singular federal statute, 28 U.S.C. § 2241 et seq., which law has been amended on various occasions over the years, the last major amendment taking place in 1996 as part of the Anti-Terrorism and Effective Death Penalty Act.[14] A perusal of these federal acts, including through the present rendition of the statute, reveals no text which would allow one to conclude that the federal habeas corpus statute trumps any other federal statute, particularly one enacted for specific application to specific circumstances such as the IAD.

Although not directly relevant to the case before us, I believe it is worth pointing out that the amendments to § 2254 enacted by Congress in 1996, which deal in part with the issuance of habeas corpus writs by federal courts involving state prisoners, considerably restricted the power of federal courts to act.[15] This

---

[13]See Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73, 81-82 (1789) ("And be it further enacted, That all the before mentioned courts of the United States, shall have power to issue writs of . . . habeas corpus . . . .").

[14]See Pub. L. 104-132 (1996). For a concise history of the writ throughout its history since the Judiciary Act up to 1996, see Carbo v. United States, 364 U.S. 611, 614-619 (1961).

[15]Among the restrictions placed on the power of federal courts to issue writs involving persons in state custody, the writ is not to issue unless the state court proceedings "(1) resulted in a decision that was contrary to, or involved, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254.

-22-

action clearly reflects Congress's concern[16] with the issues raised by the dual sovereignty that is the basis of our form of government.  See Fed. Maritime Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 751-52 (2002) ("Dual sovereignty is a defining feature of our Nation's constitutional blueprint . . . .").  Even in cases where the supremacy of federal legislation over a state law is an issue, a situation which is clearly not in the case before us, application of this principle requires a light touch, not the overbearingness[17] of a sledge hammer.[18]

---

[16]See, e.g., Lindh v. Murphy, 96 F.3d 856, 873 (7th Cir. 1996) (Easterbrook, J.) (noting that with AEDPA "[Congress intended] to move back in [the] direction" of limiting federal court habeas review); Erwin Chemerinsky, Reconceptualizing Federalism, 50 N.Y. L. Sch. L. Rev. 729, 731 (2005-2006) (citing to AEDPA as one of a number of recent shifts towards States' rights).  Cf. Wood v. Milyard, -- U.S. --, No. 10-9995 (decided Apr. 24, 2012) (upholding authority of State to waive statute of limitations defense under AEDPA, and holding that "it is an abuse of discretion" by a Court of Appeals "to override a State's deliberate waiver of a limitations defense").

[17]The majority opinion interjects a modicum of unnecessary federal arrogance, one which unfortunately permeates this entire controversy, when it states that "[t]he Supremacy Clause operates only in one direction."  Maj. Op. at 11.

[18]We further digress to interject that the crimes Pleau is alleged to have committed -- armed robbery and murder of a private citizen on the way to making a deposit in the bank -- are quintessential state crimes, and betray on their face no hint of any uniquely federal interest.  See United States v. Jiménez-Torres, 435 F.3d 3, 13-15 (1st Cir. 2006) (Torruella, J., concurring) (objecting to the unwarranted extension of federal criminal jurisdiction over traditionally state crimes).  In the present case, extending federal jurisdiction over a crime with at most, de minimis impact on interstate commerce, is stretching that concept beyond the bounds of Congress's constitutional power.  Cf. United States v. Lopez, 514 U.S. 549 (1995).  Moreover, given that

Finding no specific language in any past or present configurations of the habeas statute that informs us as to the issues before us, we turn to the second, and central, <u>federal</u> statute that concerns us, the IAD.  This is a <u>federal</u> statute that deals with a <u>specific</u> issue: the attainment by one sovereign State of the body of a person in the custody or control of another sovereign State.  We are not disappointed in our search, for we find relevant language within the four corners of this <u>federal</u> statute regarding what happens when these issues come into play.  The pertinent part of this legislation, Article IV(a) of the IAD specifically states:

> [U]pon presentation of a written request for temporary custody . . . to the appropriate authorities of the State in which the prisoner is incarcerated . . . there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.[19]

---

Pleau has already agreed to plead guilty to state crimes and to a life sentence without possibility of parole, it is frankly unclear what it is that the federal government hopes to gain by its overkill.  This is particularly manifest in light of the truly extraordinary costs that will have to be invested by the federal government if it continues to pursue this capital litigation, something that in these times of economic restraint seems unduly wasteful of limited resources.

[19]18 U.S.C. app. § 2 (2012).

We need go no further, for there is nothing equivocal in this language nor is there anything else in this _federal_ statute which contravenes or dilutes the discretion that _Congress_ has granted to a State Governor pursuant to this interstate agreement, one which the United States joined as a co-equal "State."[20]  See _Mauro_, 436 U.S. at 354.

The United States became unequivocally bound by all of the provisions of the IAD upon its filing of a detainer against Pleau with the Rhode Island authorities.  See _id._ at 349.  These provisions include a grant, by the United States to the other signatory States, of the right to refuse a request for custody. There is nothing in the express language of the IAD, or its legislative history, to indicate that the grant of rights agreed to

---

[20]A comprehensive view of the IAD confirms that the United States is a coequal State for purposes of Article IV(a).  Congress amended the IAD after _Mauro_ to add specific exceptions treating the United States differently from other parties with respect to some parts of the IAD, but not article IV(a).  See Pub. L. No. 100-960, Title VII, § 7059, 102 Stat. 4403 (1988) (codified at 18 U.S.C. app. 2 § 9).  For example, Section 9 of the IAD, "Special Provisions When the United States is a Receiving State," states that a dismissal of "any indictment, information or complaint may be with or without prejudice" when the United States is a receiving state.  18 U.S.C. app. 2 § 9(1).  In contrast, when any other party to the IAD is a
receiving State, such a dismissal "shall" be with prejudice.  _Id._ § IV(e).  Section 9 does not indicate that the United States can disregard or override a sending State's denial of its request for temporary custody.  And aside from Section 9's enumerated exceptions, Congress has stuck with the IAD's definition of the United States as a "State" on the same footing as other receiving states.  See _Mauro_, 436 U.S. at 354; see also 18 U.S.C. app. 2 § 2 art. II.

by the United States with Congress' approval, id. at 353-55, is trumped in any way by other federal statutes, including the habeas corpus statute. Thus, we proceed to discuss the majority's interpretation of the Supreme Court's holding in Mauro, an interpretation which inevitably leads them to their erroneous conclusions.

### III.

As is true with most cases, Mauro cannot be read by isolating those parts that may conveniently support a predestined point of view. Properly considered, a case needs to be read and analyzed in all its parts and in a coordinated fashion. Unfortunately, this the majority fails to do.

In Mauro, the Supreme Court had before it two related cases, both of which have relevance to the present appeal because they establish "the scope of the United States' obligations under the [IAD]." Id. at 344. In the first of these cases, Case No. 76-1596, the question presented was whether a writ of habeas corpus ad prosequendum constituted a "detainer" under the IAD, whose filing with state authorities triggered the application of the provisions of that statute. Id. Respondents Mauro and Fusco were serving state sentences in New York's penal system when the U.S. District Court for the Eastern District of New York issued ad prosequendum writs directing the state prison authorities to turn them over to the federal authorities. Id. Mauro and Fusco were

arraigned in federal court and entered pleas of not guilty to the relevant charges. Id. Their trial was delayed, and because of overcrowding in federal facilities, they were returned to state custody. Id. at 344-45. Both respondents were later returned to federal custody pursuant to new ad prosequendum writs, but not before they had filed motions to dismiss the federal indictments, alleging that the United States had violated Article IV(e) of the IAD by returning them to state custody without first trying them on the federal indictment.[21] The district court granted the motions, ruling that the ad prosequendum writs were in effect detainers, whose filing by the United States triggered application of the provisions of the IAD, Article IV(e) of which required dismissal of the indictment. Id. at 345. This decision was affirmed by the Court of Appeals for the Second Circuit. 544 F.2d 588 (2d Cir. 1976).

In the second case, No. 77-52, the respondent, Ford, was arrested in Chicago on two federal warrants. Ford was turned over to state authorities in Illinois for extradition to Massachusetts on unrelated Massachusetts state charges. Mauro, 436 U.S. at 345-46. At this point Ford requested a speedy trial on federal charges pending in the Southern District of New York, sending letters to

---

[21]Article IV(e) requires dismissal of an indictment against a prisoner who is obtained by a receiving State, if he is returned to his original place of imprisonment without being tried on the indictment underlying a detainer by which custody was secured. 18 U.S.C. app. § 2 (2012).

this effect to the District Court and the U.S. Attorney for that District. Id. at 346. After Ford was transferred to Massachusetts, the U.S. Attorney in New York lodged a detainer with Massachusetts state officials. Ford was found guilty at his trial on the Massachusetts state charges. Thereupon, Massachusetts produced Ford in the U.S. District Court for the Southern District of New York pursuant to an ad prosequendum writ. Id. After Ford pled not guilty to the federal charges, his trial date was sequentially postponed for 17 months at the government's or court's initiative. At some point Ford formally moved for dismissal of the federal charges on constitutional speedy trial grounds, which motion was denied by the district court. Id. In the meantime Ford had been returned to Massachusetts, where he remained until he was returned to New York for trial pursuant to another ad prosequendum writ. Id. at 347.

At the beginning of the trial Ford renewed his motion to dismiss on speedy trial grounds, which claim was again rejected by the district court. Id. He was found guilty, whereupon he appealed, alleging violation of Article IV(e) of the IAD because he was not tried within 120 days of his initial arrival in the Southern District of New York. Id. at 347-48. The Second Circuit reversed the conviction and dismissed the indictment, 550 F.2d 732 (2d Cir. 1977), holding: (1) that since the government had filed a detainer, thus triggering the provisions of the IAD to which the

-28-

government was a party, (2) the subsequent ad prosequendum writ constituted a "written request for temporary custody" under Article IV(a) of the IAD, (3) which required that trial be commenced within 120 days of the prisoner's arrival in the receiving state, and therefore (4) the delay in trial mandated dismissal of the federal charges. See Mauro, 436 U.S. at 348.

The Supreme Court granted certiorari in both cases, which were consolidated for the purpose of considering "whether the Agreement governs use of writs of habeas corpus ad prosequendum by the United States to obtain state prisoners." Id. at 349 (emphasis added). The Court held "[i]n No. 76-1596 . . . that such a writ . . . is not a detainer within the meaning of the Agreement and thus does not trigger the application of the Agreement." Id. (emphasis added). However, the Court then ruled "in No. 77-52 . . . that the United States is bound by the Agreement when it activates its provisions by filing a detainer against a state prisoner and then obtains his custody by means of a writ of habeas corpus ad prosequendum." Id. (emphasis added).

Given this clear statement, I cannot fathom how a serious argument can be made that the United States is not fully bound by all the provisions of the IAD. Indeed, the Court in Mauro specifically rejected the argument that the United States "became a party to the [IAD] only in its capacity as a 'sending State.'" Id. at 353-54. As the Court emphasized:

-29-

> The statute itself gives no indication that the United States is to be exempted from the category of receiving States. To the contrary, Art. VIII states that "[t]his agreement shall enter into _full_ force and effect as to a party State when such State has enacted the same into law."

Id. at 354 (_emphasis in the original_). Referring to the IAD's "brief legislative history," the Court noted that "there is no indication whatsoever that the United States' participation in the Agreement was to be a limited one." _Id._ at 355.[22]

Having clearly established that the United States is bound by _all_ terms of the IAD, the Court then proceeded to consider this question: under what circumstances is the IAD invoked, such that the United States becomes bound by its terms? The Court answered this question straightforwardly: "Once the Federal Government lodges a detainer against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the United States _must_ comply with its provisions." _Id._ at 361-62 (emphasis added). The Court then made clear that _once the IAD has been invoked_, what is _ostensibly_ an _ad prosequendum_ writ is _treated as_ a "request for temporary custody" under the IAD:

---

[22]In fact, neither Senator Roman Hruska (R. Neb.), who commented briefly in favor of the passage of the IAD, "nor anyone else in Congress drew a distinction between the extent of the United States' participation in the Agreement and that of the other member States, an observation that one would expect had the Federal Government entered into the Agreement as only a sending State." _Id._

> [O]nce a detainer has been lodged, the United
> States has precipitated the very problems with
> which the Agreement is concerned.  Because at
> that point the policies underlying the
> Agreement are fully implicated, we see no
> reason to give an unduly restrictive meaning
> to the term "written request for temporary
> custody."  It matters not whether the
> Government presents the prison authorities in
> the sending State with a piece of paper
> labeled "request for temporary custody" or
> with a writ of habeas corpus <u>ad prosequendum</u>
> demanding the prisoner's presence in federal
> court on a certain day; in either case the
> United States is able to obtain temporary
> custody of the prisoner. Because the detainer
> remains lodged against the prisoner until the
> underlying charges are finally resolved, the
> Agreement requires that the disposition be
> speedy and that it be obtained before the
> prisoner is returned to the sending State. The
> fact that the prisoner is brought before the
> district court by means of a writ of habeas
> corpus <u>ad prosequendum</u> in no way reduces the
> need for this prompt disposition of the
> charges underlying the detainer. <u>In this
> situation it clearly would permit the United
> States to circumvent its obligations under the
> Agreement to hold that an ad prosequendum writ
> may not be considered a written request for
> temporary custody</u>.

<u>Id.</u> at 362 (emphasis added).

We thus come to the crux of the majority's interpretation of <u>Mauro</u>, which requires, according to its views of that case and the IAD, the rejection of Governor Chafee's contentions[23] that: (1) the filing of a detainer by the United States triggered the right of Governor Chafee under Article IV(a) to refuse to surrender a

---

[23]Since Pleau's arguments are essentially identical to Governor Chafee's, we will refer to them as Governor Chafee's arguments.

-31-

prisoner within 30 days of a request for custody; and (2) allowing the United States to circumvent this provision by seeking the production of the prisoner by the use of a subsequent <u>ad prosequendum</u> writ in effect voids that statutory provision and renders ineffective an important right in the Agreement. The majority's view of <u>Mauro</u> rests, at least partially, on its statement that "<u>Mauro</u> . . . reject[ed] the suggestion that, if the Court upheld the time limit on the IAD proceeding, a state governor could in some other case frustrate a writ of habeas corpus by refusing to surrender a prisoner to federal court." Maj. Op. at 6. There is simply no backing in <u>Mauro</u>, or elsewhere, for this contention.

The majority claims that "the Court distinguished between the time limits of Article IV(c) triggered by the detainer and Article IV(a)'s reservation of the governor's power to withhold consent." Maj. Op. at 7-8 (citing <u>Mauro</u>, 436 U.S. at 363-64). It is true that the particular circumstances of <u>Mauro</u> implicated the IAD's time limit provisions. However, nothing in <u>Mauro</u> suggests that the Court's holding is limited such that an <u>ad prosequendum</u> writ is treated as a "written request" for Article IV(c) purposes but not for Article IV(a) purposes. The majority contends that such a limiting principle is found in the passage from <u>Mauro</u> that it quotes on p. 8: "We are unimpressed . . . .," <u>Mauro</u>, 436 U.S. at 363. Yet when one reads and analyzes what was actually stated by

-32-

the Court in the cited passage, it becomes clear that the majority's reading of it is wrong.

To understand the true meaning of this passage, we must first read it in its full context. The <u>Mauro</u> court first stated its conclusion that "it clearly would permit the United States to circumvent its obligations under the Agreement to hold that an <u>ad prosequendum</u> writ may not be considered a written request for temporary custody." 436 U.S. at 362. Then, in the next paragraph of the opinion, the Court addressed some of the arguments the Government had raised <u>in opposition to</u> the conclusion the Court had just announced. It is in this context that the passage in question appears:

> The Government points to two provisions of the Agreement which it contends demonstrate that "written request" was not meant to include <u>ad prosequendum</u> writs; **neither argument is persuasive.** First, the government argues that under Article IV(a) there is to be a 30-day waiting period after the request is presented during which the Governor of the sending State may disapprove the receiving State's request. Because a writ of habeas corpus <u>ad prosequendum</u> is a federal-court order, it would be contrary to the Supremacy Clause, **the United States argues**, to permit a State to refuse to obey it. **We are unimpressed.** The proviso of Art. IV(a) does not purport to augment the State's authority to dishonor such a writ. As the history of the provision makes clear, it was meant to do no more than **preserve previously existing rights of sending States**, not to expand them. **[Fn. 28. Both Committee Reports note that "a Governor's right to refuse to make a prisoner available is <u>preserved</u> . . . ."  The Council of State**

-33-

> **Governments discussed the provision in similar terms: "[A] Governor's right to refuse to make the prisoner available (on public policy grounds) is <u>retained</u>.]  If** a State never had authority to dishonor an <u>ad prosequendum</u> writ by a federal court, then this provision could not be read as providing such authority. Accordingly, we do not view the provision as being inconsistent with the inclusion of writs of habeas corpus ad prosequendum within the meaning of "written requests."

<u>Id.</u> at 363 (bold emphasis added; underlined emphasis in original) (internal citations omitted).

When the passage is read in context, its meaning is plain.  The Court did not say that it was "unimpressed" with the possibility that a state could disobey an <u>ad prosequendum</u> writ that was treated as a request for custody under the IAD.  Instead, the Court said it was "unimpressed" <u>with the Government's argument</u>, which was that treating an <u>ad prosequendum</u> writ as a request for custody under the IAD, pursuant to which the state could refuse to obey, would create a Supremacy Clause problem.  The Court was "unimpressed" with the Government's argument because Article IV(a) did not expand the rights of the states in this respect but merely "preserved" and "retained" previously existing rights of a Governor "to refuse to make the prisoner available (on public policy grounds)."  <u>Id.</u> at 363 n.28.[24]  Since treating an <u>ad prosequendum</u>

_____

[24]As noted by the majority, <u>see</u> Maj. Op. at 9 n. 2, the report of the Council of State Governments states the following: "The possibility [of the Governor withholding consent] is left open merely to accommodate situations involving public policy which occasionally have been found in the history of extradition"

-34-

writ as a written request did not expand States' rights in any way, it could not have implicated the Supremacy Clause in any way.

Moreover, if anything, the statement regarding the possibility of dishonoring of the writ by State authorities is patently conditional, and not a statement as to the actual state of the law. "_If_" there was no pre-existing right to refuse, then Article IV(a) did not create it.[25]  _Id._ at 363 (emphasis added). However, as the Court specified and emphasized in Footnote 28, which immediately precedes this conditional "if," the Governor's right to refuse to make the prisoner available was "preserved" and "retained".  _Id._ at 363 n.28 (emphasis in original).

The United States's interpretation of Article IV(a), as adopted by the majority, would balkanize that provision.  According to that view, the Government would be bound by _Mauro_ as to what is meant by "written request for temporary custody" once a detainer

_____

(citation omitted).  The majority suggests that because public policy considerations had in the past arisen in the extradition context, a state's right of refusal was limited to that context. However, the Supreme Court in _Mauro_ apparently deemed the extradition context irrelevant, as neither the Court's discussion nor its quote from the Council report mentions extradition.  This makes sense: just because public policy considerations had arisen in the extradition context does not justify _limiting_ a state's right of refusal to the extradition context.

[25]This conditional language was used because there was no issue before the Court in _Mauro_ regarding a refusal by a governor to turn over a state prisoner, much less a refusal to turn over a state prisoner upon the filing of a detainer, and thereafter attempting to circumvent a governor's refusal by using a habeas writ.  Thus, the majority's claim that _Mauro_ decides this issue against Pleau and Governor Chafee contentions is unsustainable.

has been filed with the state authorities, but would be free to disregard those other parts of Article IV(a) that it now finds inconvenient to follow. Such an unprincipled reading of the IAD and <u>Mauro</u> is not only unwarranted and unprecedented, but borrowing from the majority, "fails the test of common sense." Maj. Op. at 12.[26]

## IV.

The majority takes the position it does because it fears that "[w]ere Pleau and Governor Chafee to prevail, Pleau could be permanently immune from federal prosecution, and the use of the

---

[26]In fact, the <u>Mauro</u> Court was well aware of the danger of allowing the government to pick and choose which parts of the IAD it wanted to obey. This is made clear by the manner in which the Court rejected the second of the two arguments that the government had raised against treating an <u>ad prosequendum</u> writ as a request for custody:

> The Government also points out that the speedy trial requirement of Art. IV (c) by its terms applies only to a "proceeding made possible by this article . . . ." When a prisoner is brought before a district court by means of an ad prosequendum writ, the Government argues, the subsequent proceedings are not made possible by Art. IV because the United States was able to obtain prisoners in that manner long before it entered into the Agreement. We do not accept the Government's narrow reading of this provision; rather we view Art. IV (c) as requiring commencement of trial within 120 days whenever the receiving State initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner. <u>Any other reading of this section would allow the Government to gain the advantages of lodging a detainer against a prisoner without assuming the responsibilities that the Agreement intended to arise from such an action</u>.

<u>Id.</u> at 363-64 (emphasis added).

-36-

efficient detainer system badly compromised." Maj. Op. at 13.

However, as the Mauro Court noted, the United States has a simple

way of avoiding the type of problem it created for itself in this

case:

> [a]s our judgment in No. 76-1596 indicates, the Government need not proceed by way of the Agreement. It may obtain a state prisoner by means of an ad prosequendum writ without ever filing a detainer; in such a case, the Agreement is inapplicable. It is only when the Government does file a detainer that it becomes bound by the agreement's provisions.

436 at 364 n.30. See also id. at 362 n.26 ("These problems, of

course, would not arise if a detainer had never been lodged and the

writ alone had been used to remove the prisoner, for the writ would

have run its course and would no longer be operative upon the

prisoner's return to state custody."). It was the United States's

choice to proceed against Pleau by invoking the IAD. The

consequences of allowing the United States to avoid its obligations

under a validly-enacted compact are surely graver than the

consequences of allowing Rhode Island's justice system to prosecute

Pleau.

## V.

Lastly, I do not believe that Governor Chafee's

references to Ponzi v. Fessenden, 258 U.S. 254, 260-62 (1922),

McDonald v. Ciccone, 409 F.2d 28, 30 (8th Cir. 1969), Stamphill v.

Johnson, 136 F.2d 291, 292 (9th Cir. 1943), cert. denied, 320 U.S.

766 (1943), or Lunsford v. Hudspeth, 126 F.2d 653, 655 (10th Cir.

-37-

1942), can be dismissed as cavalierly as is attempted by the majority in its claim that they are not of help in deciphering the correct answer to the questions presented by the present appeal. Maj. Op. at 10 & n.3. Nor do I agree with the majority's conclusion that the holding in United States v. Scheer, 729 F.2d 164, 170 (2d Cir. 1984), which is clearly favorable to Governor Chafee's position, is either dicta or "properly described as a misreading of Mauro." Maj. Op. at 11-12. A balanced appraisal of these cases, when they are actually read and analyzed, creates some doubt as to the majority's dismissal.

In Scheer the Second Circuit passed upon the very issue before us: the effect on Article IV(a) of the IAD of a habeas writ filed subsequent to a detainer. A federal grand jury in Vermont indicted Scheer for several alleged violations of federal firearms statutes. 729 F.2d at 165. Thereafter, on March 15, 1982, Scheer was arrested in California on state criminal charges. Id. While Scheer was in jail awaiting disposition of the state charges, the federal authorities learned of his whereabouts, and in April, pursuant to the IAD, filed a detainer with the California authorities on the federal charges pending in Vermont. Id. On May 27 Scheer pled guilty to the California charges and was sentenced to 16 months imprisonment. At this point, Scheer contacted the U.S. Attorney's Office in Vermont requesting a prompt resolution of the federal charges, following this request with a June 7 telegram

substantially repeating this petition.  Id.  In the meantime, on May 28, the government secured an ad prosequendum writ from the District Court in Vermont, which was executed on June 5 when U.S. Marshals took custody of Scheer and proceeded to bring him to Vermont.  Id.  After Scheer was arraigned in the District of Vermont, a series of motions and incidences followed, with Scheer's trial date finally set for March 2, 1983.  Id. at 165-66.  Prior thereto, Scheer filed a motion to dismiss claiming that the government had violated several provisions of the IAD.  Id. at 166. The motions were denied and immediately thereafter Scheer was tried and found guilty.  Id.  This outcome was set aside and a new trial was granted, before which Scheer entered a plea of guilty, reserving the right to appeal his claims under the IAD.  Id.

Although Scheer alleged violations of Article IV(a), (b), and (c), only the disposition regarding paragraph (a) is of direct interest to this appeal.  Scheer argued that Article IV(a) was violated because the U.S. Marshals transferred him to Vermont less than 30 days after the issuance of the ad prosequendum writ.  Id. at 170.  The court ultimately rejected this argument on the ground that Scheer had waived his right to contest the transfer.  Id. at 170-71.  However, in so ruling, the court clarified the relationship between an ad prosequendum writ and the IAD:

> The 30-day provision was plainly inserted into the law to permit the . . . Governor of the sending state to order that the prisoner not be transferred. 11 Cong. Rec. 14,000, 38,841.

-39-

Although it could be argued that the proviso applies only to "State" parties to the Agreement and not the United States, that position is difficult to justify since the definition of "State" in the Act includes the United States. What little legislative history exists indicates that the United States and the District of Columbia became full parties to the Agreement with the States . . . More significantly, the Supreme Court has indicated that Article IV(a) envisions that following the filing of a written notice of request for custody "[f]or the next 30 days, the prisoner and prosecutor must wait while the Governor of the sending State, on his own motion or that of the prisoner, decides whether to disapprove the request." <u>Cuyler</u> v. <u>Adams</u>, 449 U.S. 433, 444 (1981).

The Government urges that we hold the 30-day period not violated because the writ of habeas corpus <u>ad prosequendum</u> was not abrogated by the United States becoming a party to the Act. We recognize that the historic power of a federal court to issue such a writ to secure a state prisoner for federal trial has existed since Chief Justice Marshall held it was included under the rubric of habeas corpus . . . . Nonetheless, employing that rationale would be treating the federal government's participation in the IAD on a different footing than that of the States. Further, the Supreme Court has held that once a detainer has been lodged as here, it triggers the procedural rules of the ACT so that the later filing of a writ of habeas corpus <u>ad prosequendum</u> is simply equivalent to a "written request for temporary custody" and may not be used as a basis for the federal government to avoid its obligations under the Act. <u>United States</u> v. <u>Mauro</u>, 436 U.S. at 362. <u>Thus the power of the writ seems unavailing once the government elects to file a detainer in the course of obtaining a state prisoner's presence for disposition of federal charges</u>.

729 F.2d at 170 (emphasis added).

Ponzi, on which several of the cases cited by Chafee and Pleau are based, also bears closer analysis than is given by the majority.  The majority points out that Ponzi "neither held nor said that a state governor may invoke comity principles to disobey a federal habeas writ." Maj. Op. at 10.  But nor did Ponzi say the opposite: that a state governor may not disobey a federal writ.  Ponzi is important because, since it is a pre-IAD case, its explanation of the principle of comity sheds light on the rights that existed prior to the Agreement, which were "preserved" and "retained" by the State governors under Article IV(a).  Mauro, 436 U.S. at 363 n.28 (emphasis in original).  As Chief Justice Taft explained in Ponzi:

> The chief rule which preserves our two systems of courts from actual conflict of jurisdiction is that the court which first takes the subject-matter of the litigation into its control, whether this be person or property, must be permitted to exhaust its remedy, to attain which it assumed control, before the other court shall attempt to take it for its purpose. The principle is stated by Mr. Justice Matthews in Covell v. Heyman . . . as follows:

> "The forbearance which courts of coordinate jurisdiction, administered under a single system, exercise toward each other whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between the state courts and those of the United States it is something more. It [is] a principle of right and law, and therefore, of necessity.  It leaves nothing to discretion or mere convenience.

-41-

These courts do not belong to the same system, so far as their jurisdiction is concurrent: and although they coexist in the same space, they are independent, and have no common superior. They exercise jurisdiction, it is true, within the same territory, but not in the same plane; and when one takes into its jurisdiction a specific thing, that res is as much withdrawn from the judicial power of the other, as if it had been carried physically into a different territorial sovereignty."

258 U.S. at 260 (quoting Covell v. Heyman, 111 U.S. 176, 182 (1884)).

The cases that the majority claims "misread[]" Ponzi, Maj. Op. at 9, do nothing of the sort. In Lunsford, the Tenth Circuit cited Ponzi for the

now axiomatic rule of law that a sovereignty, or its courts, having possession of a person or property cannot be deprived of the right to deal with such person or property until its jurisdiction and remedy is exhausted and no other sovereignty, or its courts, has the right or power to interfere with such custody or possession . . . As an easy and flexible means of administering justice and of affording each sovereignty the right and opportunity to exhaust its remedy for wrongs committed against it, there has evolved the now well established rule of comity which is reciprocal, whereby one sovereignty having exclusive jurisdiction of a person may temporarily waive its right to the exclusive jurisdiction of such person for purposes of trial in the courts of another sovereignty . . . The privileges granted by this flexible rule of comity should and must be respected by the sovereignty to which it is made available, and this respectful duty is reciprocal, whether federal or state . . . .

Lunsford, 126 F.2d at 655.  Similarly, in Stamphill, the Ninth

Circuit relied on Ponzi for the proposition that

> [t]here is no doubt that the state of
> Oklahoma, having first acquired jurisdiction
> over the appellant, was entitled to retain him
> in custody until he had finished his sentence
> and could not be required to surrender him to
> the custody of the United States marshal for
> trial in the federal court for an offense
> committed in violation of federal law.

136 F.2d at 292.  In McDonnell, in turn, the Eighth Circuit relied

on both Stamphill and Lunsford for the proposition that although

the federal court in Texas could issue a writ of habeas corpus ad

prosequendum, "[t]he release by the state authorities . . . is

achieved as a matter of comity and not of right."  409 F.2d at 30.

In light of Ponzi's reference to a "principle of comity . . .

between the state courts and those of the United States" that is a

"principle of right and law, and therefore, of necessity," 258 U.S.

at 260 (quoting Covell, 111 U.S. at 182), I fail to see how

Stamphill, Lunsford, and McDonnell can be said to have "misread"

Ponzi in any way.

## VI.

The sum and summary of all of the matters that I have

punctuated leads to an inevitable and straightforward outcome, one

which, like the forest for the trees, is ignored by some.  We are

confronted with two federal statutes -- the IAD and the habeas

corpus statute, 28 U.S.C. § 2241.  We have a Supreme Court case --

<u>Mauro</u> -- that plainly explains how these statutes interact.  From these three guideposts, the proper legal route is easily charted:

1.  The IAD is an interstate compact which, upon Congressional approval, the United States joined as an equal member with 48 other States, this Agreement becoming federal law.

2.  The filing of a detainer against Pleau by the United States triggered the application of the full Agreement, including all of the rights that the United States granted to other States under the Agreement.

3.  Under <u>Mauro</u>, because the United States triggered the IAD before seeking an <u>ad prosequendum</u> writ, the writ is treated as a request for custody under the IAD.

4.  Because the writ is treated as a request for custody under the IAD, Governor Chafee had the right under Article IV(a) to refuse to transfer Pleau.

I cannot agree with the contrary result reached by the majority.  The Supremacy Clause does not justify the majority's result because the Supremacy Clause is not implicated here.  <u>Mauro</u> cannot justify the result because <u>Mauro</u>, properly read, supports the panel's original opinion.  The equities of the case, even if they weighed in favor of the United States (and they do not), cannot justify the majority's result because this court has no authority to ignore the express terms of the IAD.

I respectfully dissent.